NAVEGAR, INC., d/b/a Intratec, &
Penn Arms, Inc., Plaintiffs,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 95–0550 (RCL).

United States District Court,
District of Columbia.

Feb. 1, 1996.

**633**

Richard Earnest Gardener, Fairfax, VA, for Plaintiffs.

Sandra Schraibman and Andrea Newmark, U.S. Department of Justice, Federal Programs Branch, Washington, DC, for Defendant.

*MEMORANDUM AND ORDER*

LAMBERTH, District Judge.

This matter comes before the court on a motion filed by the government for judgment on the pleadings or for summary judgment on the question of jurisdiction. The government argues in its motion for summary judgment that plaintiffs' pre-enforcement constitutional challenge to § 922(v) and § 922(w) of the Gun Control Act does not constitute a justiciable controversy under

Article III because plaintiffs fail to demonstrate the existence of a genuine threat of prosecution. With respect to its motion for judgment on the pleadings, the government contends that plaintiffs' pre-enforcement challenge is barred by the doctrine of ripeness as a prudential matter. Upon consideration of the filings and arguments by counsel, the Court finds that plaintiffs fail to demonstrate the existence of a genuine threat of prosecution as required by Article III. Because plaintiffs lack standing to bring this pre-enforcement challenge, the Court shall grant defendant's motion for summary judgment on jurisdictional grounds.[1] Accordingly, plaintiffs' pre-enforcement challenge to § 922(v) and § 922(w) of the Gun Control Act shall be dismissed for lack of a justiciable controversy. The court's reasoning is set forth below.

I.

BACKGROUND

On September 13, 1994, President Clinton signed into law, as part of the 1994 Crime Control Act, amendments to the criminal provisions of the previously amended Gun Control Act of 1968. These new amendments restricted for ten years the manufacture, transfer or possession of certain semiautomatic assault weapons, and the transfer or possession of large capacity ammunition feeding devices. The statutory provisions were effective immediately.

Plaintiffs are two manufacturers of semiautomatic assault weapons. Plaintiff Navegar, Inc. ["Intratec"] was the sole manufacturer of the TEC–DC9[2] and TEC–22 semiautomatic pistols and the thirty-two round detachable box magazines for the TEC–DC9. Plaintiff Penn Arms, Inc. ["Penn Arms"] was the sole manufacturer of the Striker 12 series 12–gauge shotgun and the 12 round spring motor driven revolving magazine for the Striker 12 series shotgun.

---

1. The Court's resolution of the jurisdiction issue against the plaintiff obviates the need to consider the merits of the pleadings.

2. The Intratec TEC–DC9 is simply the Intratec TEC–9 renamed. *See* Owen Decl. ¶ 7. Both the TEC–DC9 and the TEC–9 are listed by name as restricted semiautomatic assault weapons in § 921(a)(30)(A)(viii) of the Crime Control Act.

On September 13, 1994, Intratec was visited by regulatory inspectors from the Bureau of Alcohol, Tobacco & Firearms ("ATF") and informed that § 922(v) of the newly amended Gun Control Act prohibited the manufacturing of new TEC–DC9 and TEC–22 semiautomatic pistols unless the guns were for sale to entities enumerated in the Act.[3] At that time, Intratec had in its inventory some 43,-254 frames for its TEC–DC9 and some 9,371 frames for its TEC 22.[4] According to Intratec, these frames could only be used for the manufacturing of TEC–DC9 and TEC–22.

ATF inspectors also informed Intratec that § 922(w) of the newly amended Gun Control Act prohibited the manufacturing of its 32–round magazines for the Intratec TEC–DC9 and TEC–22 pistols.[5] At that time, Intratec had in inventory an estimated $30,000 worth of magazine parts. *See* Aff. of Martha Fernandez, ¶ 9.

ATF inspectors also visited the premises of Penn Arms on September 13, 1994, and informed Penn Arms that § 922(v) prohibited

the future manufacture of the Striker 12 series shotguns.[6] At the time, Penn Arms had in its inventory some $58,000 worth of component parts unique to the Striker 12 series shotguns.

On September 26, 1994, the ATF sent letters to all federally licenced firearm manufacturers, including Intratec and Penn Arms, to advise them that identifiable semiautomatic assault weapons, if lawfully possessed on September 13, 1994, could be "grandfathered" under § 922(v)(2) and could be assembled and sold to non-enumerated persons or entities. The letter further advised that because some firearms manufacturers may have been unaware of ATF's policy of "grandfathering" weapons, ATF would permit manufacturers to package or group together for future assembly component parts of unassembled weapons for an additional seven days, after which the ATF would conduct a final inventory to create a contemporaneous record identifying all "grandfathered" weapons.

**3.** 18 U.S.C. § 922(v) makes it "unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon." *Id.* The statutory definitions of "semiautomatic assault weapon"—§ 921(a)(30)(A)(viii) and § 921(a)(30)(C)—encompass weapons such as the TEC–DC9 and TEC–22. Section 921(a)(30)(A)(viii) provides:

(A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as— ... (viii) Intratec TEC–9, TEC–DC9 and TEC–22. *Id.* Section § 921(a)(30)(C) provides:

(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—(i) an ammunition magazine that attaches to the pistol outside of the pistol grip; (ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (iii) a shroud barrel that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the non-trigger hand without being burned; (iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and (v) a semiautomatic version of an automatic firearm. . . .
*Id.*
Additionally, ATF Agents informed Intratec that the prohibition on manufacturing these semiautomatic weapons did not apply to weapons sold to entities enumerated in § 922(v)(4)(A). Section 922(v)(4)(A) provides:
Paragraph (1) shall not apply to—the manufacture for, transfer to, or possession by the United States or department or agency of the United States or a State or a department, agency,

or political subdivision of a State, or a transfer to or possession by a law enforcement officer employed by such an entity for purposes of law enforcement (whether on or off duty).

*Id.*

**4.** The frame is "[t]hat part of a firearm which provides housing for the hammer, bolt, breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 CFR § 178.11. The frames for the TEC DC–9 and TEC–22 are molded plastic, with the identifiers "TEC–DC9" and "TEC–22" molded into the frame. According to INTRATEC, these identifiers cannot be deleted. *See* Aff. of Martha Fernandez, ¶ 5.

**5.** Paragraph (1) of § 922(w) makes it "unlawful for a person to transfer or possess a large capacity ammunition feeding device." The Act defines "large capacity feeding ammunition feeding device" to include, *inter alia:*

(A) ... a magazine .. manufactured after the date of enactment of the Violent Crime Control and Law Enforcement Act of 1994 that has a capacity of ... more than 10 rounds of ammunition. . . .
18 U.S.C. § 921(a)(31).

**6.** Under § 921(a)(30)(A)(ix), revolving cylinder shotguns such as the Striker 12 series shotguns are treated as "semiautomatic assault weapons" for purposes of § 922(v).

Pursuant to this policy, Intratec assembled 4,401 TEC–DC9 pistols and 3,502 TEC–22 pistols from complete part sets. However, Intratec continues to hold in its inventory over 40,000 unmatched TEC–DC9 and TEC–22 frames and thousands of dollars of unmatched gun parts. Penn Arms was unable to package complete part sets prior to the expiration of the seven day period, and as a result, Penn Arms was unable to assemble complete weapons that could be "grandfathered" under § 922(v)(2).

Within six months of the enactment of the amendments, Intratec and Penn Arms filed an action for declaratory judgment pursuant to 28 U.S.C. § 2201 challenging: (1) the constitutionality of the prohibition by § 922(v)(1) on manufacturing the Intratec TEC–DC9 and TEC–22 pistols and the Striker 12 series shotguns; and (2) the constitutionality of the prohibition by § 922(w)(1) on manufacturing magazines for the TEC pistols and the Striker 12 series shotgun.[7] Shortly thereafter, the government filed the present motion.

## II.

## DISCUSSION

■ "Article III of the Constitution confines the federal courts to adjudicating actual 'cases' and 'controversies.' " *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Federal courts have developed a variety of doctrines—including ripeness, standing, political question, and the like—to clarify, and in some instances, elaborate on the case or controversy requirement. All of these doctrines are "founded in concern about the proper—and properly limited—role of the courts in a democratic society." *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975).

■ This principle of restraint, as embodied in these jurisdictional doctrines, takes on added significance in the context of actions for declaratory judgement. The ability of the judiciary to declare a law unconstitutional "does not amount to an unlimited power to survey the statute books and pass judgment

on laws before the courts are called on to enforce them." *Younger v. Harris*, 401 U.S. 37, 52, 91 S.Ct. 746, 754, 27 L.Ed.2d 669 (1971). Rather, the federal judicial power to review the constitutionality of a statute is to be exercised only when dictated by utmost necessity and "only at the instance of one who is himself immediately harmed, or immediately threatened with harm." *Poe v. Ullman*, 367 U.S. 497, 503, 81 S.Ct. 1752, 1755, 6 L.Ed.2d 989 (1961). Such an exercise of federal judicial power can be "legitimate only in the last resort, and as a necessity in the determination of real, earnest and vital controversy between individuals." *Chicago & Grand Trunk Ry Co. v. Wellman*, 143 U.S. 339, 345, 12 S.Ct. 400, 402, 36 L.Ed. 176 (1938).

■ Article III imposes an injury-in-fact requirement on plaintiffs who present claims in federal court. The plaintiff must demonstrate, at an "irreducible constitutional minimum," that (1) he personally suffered a "concrete and particularized" injury in fact (2) which is "fairly traceable to the challenged action of the defendant," and (3) "likely, as opposed to merely speculative, [to] be redressed by a favorable decision." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 2130, 119 L.Ed.2d 351 (1992); *accord Valley Forge Christian College v. Americans United*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The injury-in-fact must be "actual or imminent," not "conjectural" or "hypothetical." *Lujan*, 504 U.S. at 560, 112 S.Ct. at 2136. Moreover, it is the party who "seeks the exercise of jurisdiction in his favor" who bears the burden of demonstrating that "he is the proper party to invoke judicial resolution of the dispute." *FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231, 110 S.Ct. 596, 608, 107 L.Ed.2d 603 (1990).

■ The injury-in-fact requirement of Article III requires plaintiffs who challenge the constitutionality of a criminal statute to "show a 'reasonable threat of prosecution for conduct allegedly protected by the Constitu-

---

7. Plaintiffs later filed an amended complaint on September 6, 1995, which sets out the same

claims with greater specificity.

tion.'" *Ripplinger v. Collins,* 868 F.2d 1043, 1047 (9th Cir.1989) (citation omitted). The threat must be "genuine," *Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505 (1974), and "alive at each stage of the litigation." *Ellis v. Dyson,* 421 U.S. 426, 435, 95 S.Ct. 1691, 1696, 44 L.Ed.2d 274 (1975). In the absence of an indictment, arrest, or immediate threat of prosecution, such a plaintiff has no "live" case or controversy with those charged with enforcing the statute. In such cases, courts routines dismiss plaintiffs for lack of standing. *See, e.g., Younger,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Int'l Tape Manuf. Ass'n v. Gerstein,* 494 F.2d 25 (5th Cir.1974); *Lion Mfg. Corp. v. Kennedy,* 330 F.2d 833 (D.C.Cir.1964); *Oefinger v. Baker,* No. 86–1396 (D.D.C. Oct. 29, 1986).

■ The government argues in its motion for summary judgment that plaintiffs' pre-enforcement constitutional challenge to § 922(v) and § 922(w) of the Gun Control Act does not constitute a justiciable case or controversy because plaintiffs fail to demonstrate the existence of a genuine threat of prosecution. Plaintiffs, however, contend that the visits by ATF inspectors and the representations made by those ATF inspectors concerning the lawfulness of plaintiffs' gun manufacturing activities constitute a reasonable threat of prosecution. This cannot be the case. The firearm industry is a regulated one, *United States v. Biswell,* 406 U.S. 311, 315, 92 S.Ct. 1593, 1596, 32 L.Ed.2d 87 (1972), and visits to manufacturing facilities by ATF inspectors is not unusual. Indeed, "[i]spectors in ATF's Office of Regulatory Enforcement *routinely* examine inventory and records at the business premises of federally licensed firearm manufacturers, importers, and dealers as authorized by, and pursuant to, 18 U.S.C. § 923(g)." Suppl. Cates Decl. ¶ 3 (emphasis added).

Furthermore, ATF inspectors are neither authorized to conduct criminal investigations nor empowered to prosecute regulated entities. As explained by the Terry Cates, Chief of the Firearms and Explosive Regulatory Division of the Bureau of Alcohol, Tobacco, and Firearms:

> ATF is ... comprised of two primary operational units—the Office of Criminal Enforcement and the Office of Regulatory Enforcement. Special Agents in the ATF's Office of Criminal Enforcement conduct criminal investigations of violations of laws ... and make recommendations to the United States Attorneys concerning criminal prosecutions. Inspectors in ATF's Office of Regulatory Enforcement conduct regulatory inspections of, *inter alia,* Federal firearms licensees, and make recommendations with respect to administrative actions against licensees. *ATF inspectors are not authorized to conduct criminal investigations, make arrests, seize property, and must, in accordance with agency guidelines, refer potential criminal matters to ATF's Office of Criminal Enforcement.*

*Id.* at ¶ 2 (emphasis added).

At Cates' direction, ATF field inspectors visited the premises of *all* assault weapons manufacturers—not merely the two plaintiffs in this case—to compile a record of all weapons that would fall under § 922(v)(2), the "Grandfather" clause of the Gun Control Act. Neither ATF special agents nor any other person with prosecutorial authority accompanied the inspectors who conducted the inventories of semiautomatic assault weapons at plaintiffs' premises. Additionally, no referrals were made to ATF's Office of Criminal Enforcement. In light of these circumstances, there is no basis to conclude that the representations made by the ATF inspectors as to the lawfulness or unlawfulness of plaintiffs' manufacturing activities constitute a credible threat of prosecution.

■ Plaintiffs also argue that they ceased production and sale of semiautomatic assault weapons based on the fear of prosecution instilled by the ATF visits, and as a result, suffered economic losses. In other words, plaintiffs contend that economic losses caused by fear of prosecution—regardless of whether such fear was warranted under the circumstances—satisfy the standing requirements of Article III. The fact that a criminal statute may force an individual "into either abstaining from [the prohibited conduct] or becoming a criminal in order to [engage in

it]," does not confer standing. *George v. Texas,* 788 F.2d 1099, 1100 (5th Cir.), *cert. denied,* 479 U.S. 866, 107 S.Ct. 226, 93 L.Ed.2d 153 (1986). This is because "[e]very criminal law, by its very existence, may have some chilling effect on personal behavior. That [is] the reason for its passage." *Doe v. Duling,* 782 F.2d 1202, 1206 (4th Cir.1986). "The mere existence of a statute ... is not ordinarily enough to sustain a judicial challenge, even by one who reasonably believes that the law applies to him and will be enforced according to its terms." *National Student Assoc. v. Hershey,* 412 F.2d 1103, 1110 (D.C.Cir.1969). Even though plaintiffs in this case, as manufacturers of semiautomatic assault weapons, are "at greater risk than the public at large," such circumstances still fall short of the requirements of Article III. *United Presbyterian Church v. Reagan,* 738 F.2d 1375, 1380 (D.C.Cir.1984). This is true irrespective of the consequences of plaintiffs' choice to cease the prohibited conduct rather than risk prosecution. *See Martin Tractor Co. v. Fed. Elec. Comm'n,* 627 F.2d 375 n. 9 (D.C.Cir.1980); *Lion Mfg. Corp. v. Kennedy,* 330 F.2d 833, 839 (D.C.Cir.1964). In the absence of a genuine threat of prosecution, plaintiffs' decision to incur financial losses will not automatically confer standing.

In sum, plaintiffs fail to meet the standing requirements necessary to mount a pre-enforcement constitutional challenge to § 922(v) and § 922(w) of the Gun Control Act. Article III requires plaintiffs to demonstrate the existence of a genuine threat of prosecution. In this case, the visits by ATF inspectors did not constitute such a threat. Moreover, the fact that plaintiffs refrained from engaging in statutorily proscribed activities to their economic detriment does not confer standing for Article III purposes. Because plaintiffs fail to meet the standing requirements of Article III, the Court shall grant defendant's motion for summary judgment on jurisdictional grounds. Accordingly, plaintiffs' pre-enforcement challenge to § 922(v) and § 922(w) of the Gun Control Act shall be dismissed for lack of a justiciable controversy.

### III.

### CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings or for summary judgment on the question of jurisdiction is hereby GRANTED, and this action is hereby DISMISSED.

SO ORDERED.