192 F.3d 1050 (D.C. Cir. 1999)
 Navegar, Incorporated, d/b/a Intratec, and Penn Arms, Incorporated, Appellants
v.
United States of America, Appellee
 No. 98-5491
 United States Court of Appeals
FOR THE DISTRICT OF COLUMBIA CIRCUIT
 Argued September 10, 1999
Decided October 8, 1999
 
 Appeal from the United States District Court for the District of Columbia(No. 95cv00550)
 Richard E. Gardiner argued the cause and was on the briefs for appellants.
 Mark B. Stern, Attorney, United States Department of Justice, argued the cause for appellee. With him on the brief were David W. Ogden, Acting Assistant Attorney General, Michael S. Raab, Attorney, and Wilma A. Lewis, United States Attorney.
 Before: Wald, Silberman and Tatel, Circuit Judges.
 Opinion for the Court filed by Circuit Judge Wald.
 Wald, Circuit Judge:
 
 
 1
 Navegar, Inc., doing business as Intratec ("Intratec"), and Penn Arms, Inc. ("Penn Arms") (together "appellants"), are licensed by the United States Bureau of Alcohol, Tobacco and Firearms ("BATF") to manufacture firearms. Intratec and Penn Arms brought a declaratory judgment action under 28 U.S.C. 2201 in the United States District Court for the District of Columbia to challenge the constitutionality of section 110102 of the Violent Crime Control and Law Enforcement Act of 1994. See Pub. L. No. 103-322, 108 Stat. 1796, 1996-98 (codified at 18 U.S.C. §§ 921(a)(30), 922(v) (1994)). Section 110102(a) makes it unlawful to "manufacture, transfer or possess a semiautomatic assault weapon." See 108 Stat. at 1996-97 (codified at 18 U.S.C. 922(v)(1)). Section 110102(b) specifically identifies the precise weapons Intratec and Penn Arms manufacture as semiautomatic assault weapons. See 108 Stat. at 1997-98 (codified at 18 U.S.C. §§ 921(a)(30)(A)(viii), (ix)). Appellants sought a declaration that these provisions exceed Congress' Commerce Clause power, and are unconstitutional Bills of Attainder.
 
 
 2
 Both the appellants and the government filed cross-motions for summary judgment on both of the constitutional challenges to the Act. See Memorandum Order and Opinion, Joint Appendix ("J.A.") at 43. The district court issued a Memorandum Order and Opinion granting the government's motion, rejecting appellants' motion and dismissing the case. We affirm the district court's grant of summary judgment on both of appellants' challenges.
 
 I. Background
 
 3
 A. The Violent Crime Control and Law Enforcement Act of1994
 
 
 4
 In 1994, Congress passed the Violent Crime Control and Law Enforcement Act. Pub. L. No. 103-322, 108 Stat. 1796 ("the Act"). Subtitle A of Title XI of the Act, which regulates assault weapons, is entitled the "Public Safety and Recreational Firearms Use Act." See Violent Crime Control and Law Enforcement Act of 1994, 110101, 108 Stat. 1796, 1996. Section 110102(a) of the Act makes it "unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon." See 18 U.S.C. 922(v)(1). Section 110102(b) defines "semiautomatic assault weapon" to include "any of the firearms, or copies or duplicates of the firearms" enumerated in nine categories of guns identifying 15 weapons by name. See 18 U.S.C. 921(a)(30)(A). Two of the categories of guns specified by the statute are "INTRATEC TEC-9, TEC-DC9, and TEC-22; and ... revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12." 18 U.S.C. §§ 921(a)(30)(A)(viii), (ix). The definition of "semiautomatic assault weapon" in section 110102(b) also includes semiautomatic rifles and semiautomatic pistols that have the ability to accept a detachable magazine and any two of five enumerated accessories, and semiautomatic shotguns that have any two of four enumerated features. See 18 U.S.C. §§ 921(a)(30)(B)(D).
 
 
 5
 Section 110102(a) of the Act contains a "grandfather" clause which exempts from the Act semiautomatic assault weapons lawfully possessed on the date of enactment. See 18 U.S.C. 922(v)(2). The Act does not apply to certain enumerated firearms as well as firearms, replicas or duplicates of firearms specified in an appendix. See id. 922(v)(3); id. App. A. Persons convicted of knowingly violating the Act are subject to a fine and imprisonment of up to five years. See id. 924(a)(1).
 
 B. Factual Background
 
 6
 Appellants are the sole manufacturers of firearms identified by name in the Act as "semiautomatic assault weapons."See 42 U.S.C. 921(a)(30)(A)(viii), (ix). Intratec is the sole manufacturer of the TEC-DC9[1] and TEC-22 semiautomatic pistols. Penn Arms is the sole manufacturer of the Striker 12, 12S, 12E and 12SE, 12-gauge revolving cylinder shotguns. See Navegar, Inc. v. United States, 914 F. Supp. 632, 633 (D.D.C. 1996). On September 13, 1994, the Act became law and agents from the BATF visited appellants' facilities to inform appellants' officers of the prohibitions of the Act and give notice that they planned to conduct inventories of the weapons that would be grand fathered. See Navegar, Inc. v. United States, 103 F.3d 994, 997 (D.C. Cir. 1997). Over the next two days, the BATF conducted these inventories. See id.
 
 
 7
 On September 26, 1994, the BATF sent letters to all federally licensed firearm manufacturers, including Intratec and Penn Arms, giving notice of the "grandfather" provision, and that the BATF would permit seven additional days of weapon manufacturing before it would take a final inventory identifying all grand fathered weapons. See Navegar, 914 F. Supp. at 633. When the additional seven-day window for grand fathering weapons closed, Intratec held in its inventory over 40,000 TEC-DC9 and TEC-22 frames and thousands of dollars of gun parts which it could no longer assemble. Penn Arms was unable to take advantage of the seven-day window and was left with an inventory of $58,000 worth of gun parts for the Striker 12 series of shotguns. See id. at 634-35.
 
 C. Procedural Background
 
 8
 In March, 1995, Intratec and Penn Arms filed a declaratory judgment action in the United States District Court for the District of Columbia, challenging the constitutionality of certain provisions of the Act. See First Amended Compl., J.A. at 9. Appellants alleged that neither 922(v)(1) nor 922(w)(1), which prohibits the transfer or possession of a large capacity feeding device, fell within the powers delegated to Congress under Article I because there were no legislative findings nor anything in the language of the Act which indicated any nexus with Congress' delegated powers. See id., J.A. at 15. In addition, appellants asserted that 922(v)(1) together with 922(a)(30)(A)(viii), (ix), singled out the TEC-DC9, TEC-22 and Striker 12 for prohibition in order to punish them for manufacturing their products and thus were unconstitutional Bills of Attainder. See id., J.A. at 15-16, 20-22. Further, they alleged that provisions using general terms to include certain types of semiautomatic rifles, pistols and shotguns, 18 U.S.C. 921(a)(30)(B)-(D), in the definition of "semiautomatic assault weapon" were void for vagueness under the Due Process clause of the Fifth Amendment. See id., J.A. at 17-20.
 
 
 9
 The government filed a motion for summary judgment on the ground that appellants did not have standing to bring a pre-enforcement challenge to the provisions of the Act since they did not demonstrate a genuine threat of prosecution. On February 1, 1996, the district court issued a Memorandum Order and Opinion granting the government's motion and dismissing appellants' case. See Navegar, 914 F. Supp. at 632. Appellants appealed the district court's decision on standing to this court. See Navegar, Inc. v. United States, 103 F.3d 994 (D.C. Cir. 1997). This court held that since the provisions prohibiting the weapons that Intratec and Penn Arms alone manufactured effectively single them out as intended targets, these provisions presented an imminent threat of prosecution sufficient to bring a pre-enforcement challenge. See id. at 1001. However, this court also held that appellants had failed to show an imminent threat of prosecution under 18 U.S.C. 921(a)(30)(B)-(D) and 922(w), which outlawed items using general terms, because nothing indicated a special priority of enforcement against appellants and the general nature of the language made it impossible to predict whether these provisions would be applied to them. See id. at 1002. Therefore, this Court reversed the part of the order of the district court relating to the enumerated powers claims challenge to 922(v)(1) and the Bill of Attainder challenge to 18 U.S.C. §§ 921(a)(30)(A)(viii), (ix) in conjunction with 922(v)(1) and affirmed the decision to dismiss the void for vagueness claims and the enumerated powers challenge to 922(w)(1). See id.
 
 
 10
 On remand to the district court, appellants sought leave to amend their complaint to demonstrate that their challenges to the general provisions of the Act were justiciable in light of this court's prior decision. See Memorandum Order and Opinion, J.A. at 43. On December 1, 1997, the district court issued an opinion denying appellants' motion to amend their complaint. See Navegar, Inc. v. United States, 986 F. Supp. 650 (1997). The district court held that the motion to amend was futile because the proposed amended complaint failed to establish standing to bring a pre-enforcement challenge to the provisions of the Act prohibiting general categories of weapons. See id. at 653. Appellants did not appeal that order.
 
 
 11
 The appellants and the government subsequently filed cross-motions for summary judgment on the enumerated powers challenge to 922(v)(1) and the Bill of Attainder challenge to 922(v)(1) in conjunction with 921(a)(30)(A)(viii), (ix). The district court held that Congress did not exceed its authority in enacting 922(v)(1) of the Act and that 922(v)(1) together with 921(a)(30)(viii), (ix) does not constitute a Bill of Attainder with respect to Intratec and Penn Arms. See Memorandum Order and Opinion, J.A. at 89. On the basis of congressional testimony discussing the Act, the legislative history of prior Acts regulating firearms and the decisions of other courts of appeals upholding the validity of the Firearms Owner Protection Act of 1986, which prohibits the "transfer or possession of machine guns," the district court held that the Act regulated activities that had a substantial effect on interstate commerce. See id., J.A. at 76. The district court further held that the Act did not constitute a Bill of Attainder because even though provisions of the Act singled out guns made by Intratec and Penn Arms, the ban on the manufacture, transfer and possession did not fall within a historical meaning of punishment, promoted non-punitive legislative purposes, and did not manifest a congressional intent to punish. See id., J.A. at 88.Therefore, the district court granted the government's motion for summary judgment, denied appellants' motion and dismissed appellants' claims. This appeal followed.
 
 II. Discussion
 
 12
 A. The Constitutional Attack Under the Commerce Clause
 
 
 13
 1.The Scope of Congress' Commerce Clause Power After Lopez
 
 
 14
 In United States v. Lopez, 514 U.S. 549 (1995), the Supreme Court refined the scope of Congress' powers under the Commerce Clause. Lopez held that the Gun Free School Zones Act of 1990, which made possession of a firearm within 1,000 feet of a school a federal offense, exceeded Congress' Commerce Clause authority. See id. at 561. The Lopez Court identified three broad categories of activity that Congress may regulate under its Commerce Clause authority: (1) The "use of the channels of interstate commerce"; (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce"; and (3) "those activities having a substantial relation to interstate commerce ... i.e., those activities that substantially affect interstate commerce." Lopez, 514 U.S. at 558-59.
 
 
 15
 The Court quickly concluded that possession of a gun in a school zone did not fit the first two categories. See id. at 559. The Court subsequently concluded that such activity could not be regulated under the third category either; it did not substantially affect interstate commerce because it was not related to any sort of economic enterprise, nor was its regulation an essential part of a larger regulation of interstate economic activity, so that the interstate regulatory scheme would be undercut unless the intrastate activity were regulated. See id. at 560. Further, the Court explained that Congress had made no findings about the effect of such activity on interstate commerce nor did the Act contain a jurisdictional element which would ensure that, as applied, the firearm possession in question would always affect interstate commerce. See id. 561-62. In addition, the Court rejected arguments made at trial about the economic costs of gun possession in school or that effective education is essential to national productivity; it said such attenuated reasoning, which would require it to pile inference upon inference to find a connection to commerce, would justify a limitless amount of regulation of intrastate activity by Congress. See id. at 564, 567. Therefore, the Court concluded that Congress had no rational basis for finding that gun possession in a school zone had a substantial effect on interstate commerce and declared the statute unconstitutional. See id. at 567.
 
 
 16
 In this case, we do not find it necessary to analyze whether the Act is a Lopez category 1 regulation of the channels of interstate commerce or a category 2 regulation of the instrumentalities of or persons or things in interstate commerce because the Act readily falls within category 3 as a regulation of activities having a substantial affect on interstate commerce.[2] The legislative history and congressional hearings conducted prior to the Act clearly manifest a congressional intent to restrict the interstate flow of "semiautomatic assault weapons," especially across the borders of states which had laws prohibiting such weapons. Furthermore, the constitutionality of the Act is supported by the history of prior firearms legislation such as the Omnibus Crime Control and Safe Streets Act of 1968 and the Gun Control Act of 1968, which contain congressional findings that there is a large interstate market in firearms and firearms legislation is aimed at controlling that market. Finally, eight other circuit courts of appeals have upheld a similar prohibition of the "transfer or possession of machine guns" against post-Lopez commerce clause challenges.[3]
 
 
 17
 2.Activities Which May Be Regulated Because they Havea Significant Effect on Interstate Commerce
 
 
 18
 Appellants argue that after Lopez, Congress only has power to regulate "economic" or "commercial" activities and since Congress passed this statute principally to regulate the criminal activity--not commercial activity--associated with possession of a semiautomatic assault weapon, the Act is not a proper exercise of the Commerce power. This court has already held that a "regulated activity ... need not be commercial, so long as its effect on interstate commerce is substantial." Terry v. Reno, 101 F.3d 1412, 1417 (D.C. Cir. 1996). Alas, appellants contend that this Court's conclusion in Terry is incorrect and "finds no support in Lopez." See Appellants' Br. at 10. Appellants badly misread both Terry and Lopez.
 
 
 19
 A close examination of Lopez reveals that it supports the reasoning of Terry. Lopez described a statute prohibiting possession of a gun within 1000 feet of a school which it struck down as involving in "no sense an economic activity that might ... substantially affect any sort of interstate commerce." United States v. Lopez, 514 U.S. 549, 567 (1995) (emphasis added). However, the Lopez Court pointedly left out both "economic" and "commercial" when it concluded in a normative vein that "the proper test requires an analysis of whether the regulated activity 'substantially affects' interstate commerce." 514 U.S. at 559. Furthermore, when the Lopez Court did use the term "economic activity," it cited as an example the home consumption of wheat at issue in Wickard v. Filburn. See Lopez, 514 U.S. at 560-61 (citing 317 U.S. 111, 127 (1942).
 
 
 20
 The Lopez Court noted that Wickard "involved economic activity in a way that the possession of a gun in a school zone does not." Id. at 560. Wickard involved a constitutional challenge to the Agricultural Adjustment Act of 1938 by farmer Roscoe Filburn. The Lopez Court specifically cited as an example of "economic activity" farmer Filburn's personal consumption of his home-grown wheat. See Lopez, 514 U.S. at 560 (quoting Wickard, 317 U.S. at 128). The passage from Wickard quoted in Lopez makes clear that wheat grown at home, even if it is not marketed, has a substantial effect on interstate commerce because it competes with wheat in commerce by supplying the " 'need of the man who grew it which would otherwise be reflected by purchases in the open market.' " Id. at 560 (quoting Wickard, 317 U.S. at 128). The Lopez Court's discussion of Wickard demonstrates that what makes a regulated activity "economic" is not that it is intrinsically commercial in any ordinary sense of the word, but rather that it "substantially affects" a larger market for the product in interstate commerce. See id. The Lopez Court made this point clear with the following quotation from Wickard:
 
 
 21
 Even if ... activity be local and though it may not beregarded as commerce, it may still, whatever its nature,be reached by Congress if it exerts a substantial econom-ic effect on interstate commerce, and this irrespective ofwhether such effect is what might at some earlier timehave been defined as 'direct' or 'indirect.'
 
 
 22
 Lopez, 514 U.S. 549 at 556 (quoting Wickard, 317 U.S. at 125) (emphasis added).
 
 
 23
 Our decision in Terry v. Reno, 101 F.3d 1412 (D.C. Cir. 1997), is a logical extension of the reasoning in Lopez. In Terry, this court upheld the Freedom of Access to Clinic Entrances Act ("FACEA") against a Commerce Clause challenge. See 101 F.3d at 1418. This court rejected the argument that Congress could not regulate protest in front of abortion clinics because protest against abortion clinics is an intrastate, noncommercial activity. See id. at 1417. We concluded that the regulated activity need not be commercial in nature, rather the only relevant inquiry is whether the effect on interstate commerce is substantial. See id. This court found that Congress had a rational basis to conclude that abortion clinics engage in interstate commerce because, among other things, they treat patients who travel interstate to obtain abortion services and obtain medical equipment and supplies through interstate commerce. See id. at 1415-16, 1417. Therefore, even though violent and obstructive protest was not an intrinsically "commercial" or "economic" activity, we upheld the FACEA because such activity had a substantially adverse effect on interstate commerce in reproductive health services. See id. at 1417-18.
 
 
 24
 The most recent Supreme Court Commerce Clause case of Camps Newfound/Owatonna, Inc. v. Town of Harrison, 520 U.S. 564 (1997), also reinforces our holding in Terry that activity need not be commercial in character in order to be regulated under the Commerce Clause. Camps involved a Commerce Clause challenge to an otherwise generally applicable state property tax exemption for charitable institutions which excluded organizations operated principally for the benefit of nonresidents. See id. at 568. The Supreme Court held that the Commerce Clause applies to activity regardless of whether it was pursued with the purpose of earning a profit. See id. at 584. The Camps Court cited an earlier opinion in which it struck down a California statute prohibiting the transport of indigent persons into the State under the Commerce Clause by holding that transportation is commerce " 'whether or not the transportation is commercial in character.' " Id. (quoting Edwards v. California, 314 U.S. 160, 166 n.1). The Camps decision makes clear that an activity can be regulated under the Commerce Clause regardless of whether it is intrinsically "economic" or "commercial" but solely on the basis of its substantial effect on interstate commerce. See National Ass'n of Home Builders v. Babbitt, 130 F.3d 1041, 1050 (D.C. Cir. 1997) (hereinafter (NAHB).
 
 
 25
 3.Whether the Activity Regulated By the Act Has aSubstantial Effect on Interstate Commerce
 
 
 26
 The Supreme Court has repeatedly held that the manufacture of goods which may ultimately never leave the state can still be activity which substantially affects interstate commerce. See United States v. Darby, 312 U.S. 100, 118-19 (1941); NLRB v. Jones & Laughlin Steel, 301 U.S. 1, 37 (1937) (holding that if manufacturing which may be intrastate in character when separately considered has a substantial effect on commerce, Congress may regulate it). Furthermore, Supreme Court precedent makes clear that the transfer of goods, even as part of an intrastate transaction, can be an activity which substantially affects interstate commerce.See Lopez, 514 U.S. at 560-61 (citing Wickard v. Filburn, 317 U.S. 127-28 (1942)) (noting that farmer's home consumption of wheat substantially affected interstate commerce)); see also Wickard, 317 U.S. at 114, 127 (noting that the farmer sold some of his wheat, and that even local marketing substantially affects interstate commerce). Therefore, it is not even arguable that the manufacture and transfer of "semiautomatic assault weapons" for a national market cannot be regulated as activity substantially affecting interstate commerce.
 
 
 27
 However, the Supreme Court's decision in Lopez does raise a question of whether mere possession of a "semiautomatic assault weapon" can substantially affect interstate commerce.For that reason, it is necessary to examine the purposes behind the Act to determine if it was aimed at regulating activities which substantially affect interstate commerce.
 
 
 28
 Appellants contend that as in Lopez, Congress in this Act did not even address the issue of whether the manufacture, transfer and possession of semiautomatic assault weapons affects Commerce. To the contrary, there is extensive legislative history indicating a firm congressional intent to control the flow through interstate commerce of semiautomatic assault weapons bought or manufactured in one state and subsequently transported into other states. First, although the legislative reports accompanying the 1994 Act do not specifically address the Commerce Clause, one report does state that the purpose of the Act was to stop the "widespread" and growing threat posed by "criminal gangs, drugtraffickers and mentally-deranged individuals armed with semiautomatic assault weapons" by "restricting the availability of such weapons in the future." See H.R. Rep. No. 103-489, at 12 (1994), reprinted in 1994 U.S.C.C.A.N. 1820, 1820.That report chronicles five years of congressional hearings on the escalating use of semiautomatic assault weapons, the difficulties such weapons cause state police officers and the disproportionate link between such weapons and drugtrafficking and violent crime. See H.R. Rep. No. 103-489, at 13-18. While the report itself does not pinpoint the effect of the regulated activities on interstate commerce, the five years of hearings discussed in the legislative report do contain extensive testimony detailing the kind and extent of interstate commerce, featuring the flow of semiautomatic assault weapons across state lines. See id. at 13.
 
 
 29
 The congressional hearings referred to in House Report 489 of the 1994 Act amply demonstrate that the ban on possession in the Act was a measure conceived to control and restrict the interstate commerce in "semiautomatic assault weapons," especially their importation into states which prohibit them. To restrict that commerce it imposed criminal liability for those activities which fuel the supply and demand for such weapons. The ban on possession is a measure intended to reduce the demand for "semiautomatic assault weapons." See United States v. Rybar, 103 F.3d 273, 283 (3d Cir. 1996) (holding that FOPA targets the mere intrastate possession of machine guns as a "demand-side measure to lessen the stimulus that prospective acquisition would have on the commerce in machine guns"); United States v. Rambo, 74 F.3d 948, 951 (9th Cir. 1995) (holding that the ban on possession is in effect " 'an attempt to control the interstate market ... by creating criminal liability' " for the " 'demand-side of the market, i.e., those who would facilitate illegal transfer out of the desire to acquire mere possession") (quoting United States v. Kirk, 70 F.3d 791, 796 (5th Cir. 1995), vacated, 78 F.3d 160 (1996)). The restriction on the manufacture and transfer of such weapons is an attempt to restrict the supply of such weapons in interstate commerce. Manufacture, transfer and possession are activities that not only substantially affect interstate commerce in "semiautomatic assault weapons," but are also the necessary predicates to such commerce. See NAHB, 130 F.3d at 1047. The ban on possession of "semiautomatic assault weapons" in this context is necessary to allow law enforcement to effectively regulate the manufacture and transfers where the product comes to rest, in the possession of the receiver. See id.; Kirk, 70 F.3d at 796; see also 1 Lawrence H. Tribe, American Constitutional Law 5-4 at 819-20 n.50 (3d ed. 2000) (suggesting that the Act in Lopez might have been upheld as a necessary and proper means of effectuating the commerce power if Congress criminalized only the possession of guns whose interstate sale or transport had been outlawed on the theory that making possession a crime would facilitate enforcement of the ban on sale or transport). The congressional testimony unmistakably shows that the purpose of the ban on possession has an "evident commercial nexus." Lopez, 514 U.S. at 580 (Kennedy, J., concurring).
 
 
 30
 For instance, Barbara Fass, the Mayor of Stockton, California, testified about the 1989 murders at a schoolyard in her city and complained that "legislation alone in our community is not sufficient." Semiautomatic Assault Weapons Act of 1989: Hearings on H.R. 1190 Before the Subcomm. on Crime of the House Comm. on the Judiciary, 101st Cong. 142 (1989) (noting that the assault weapon used was prohibited in Stockton, but the assailant subverted local laws by legally purchasing an assault weapon in Oregon and purchasing the bullets in Rhode Island). Similarly, Boston Mayor Raymond L. Flynn testified that local controls on assault weapons were ineffective since "people can still buy guns in one state and bring them into another." Assault Weapons: Hearings on S.386 and S.747 Before the Subcomm. on the Constitution of the Senate Comm. on the Judiciary, 101st Cong. 130 (1989);see also id. at 87, 143 (remarks of Sen. Simon and statement of Sen. Kennedy) (same). Richard Cook, the Chief of the Firearms Division of the BATF attested to the existence of interstate trafficking in weapons and its connection to interstate drug trafficking. See Select Crime Issues: Prevention and Punishment: Hearings Before the Subcomm. on Crime and Criminal Justice of the House Comm. on the Judiciary, 102d Cong. 43 (1991) (also noting that "New York City alone seizes some 17,000 illegal weapons each year with 96 percent coming from outside the State" as an example of the large interstate market for firearms).[4]
 
 
 31
 Congress also heard extensive testimony from police officers about the significant flow of weapons across state lines and the inability of a state to control it. The Vice President of the International Association of Chiefs of Police and Chief of Police of Greensboro North Carolina, Sylvester Daughtry, Jr., testified that "the reason there is no decrease in gun related mayhem as a result of stringent State and local gun control laws is that guns are easily purchased in less stringent locations and brought into these stricter areas.... Gun control will only work if all states are required to observe it."Public Safety and Recreational Firearms Use Protection Act: Hearing Before the Subcomm. on Crime and Criminal Justice of the House Comm. on the Judiciary, 103d Cong. 165 (1994). Fred Thomas, Chief of Police in Washington, D.C. testified that despite stringent gun control laws in the District of Columbia, gun violence did not decrease because "guns are easily purchased in less stringent locations and brought into" D.C. Assault Weapons: A View From the Front Lines: Hearing Before Senate Committee on the Judiciary, 103d Cong. 49 (1994) (also noting that of all the firearms seized by D.C. police in the previous year, 97.7 percent came from outside of D.C.). The National President of the International Brotherhood of Police Officers concluded that a national ban on assault weapons was necessary because not only do "many individuals ... travel from one state into another to circumvent state laws" which restrict the sale and use of such weapons, but "such circumvention of laws is common." See id. at 58 (statement of Kenneth T. Lyons).[5]
 
 
 32
 In sum, the congressional testimony on the bill shows that Congress was well aware that there was significant interstate traffic in semiautomatic assault weapons and that state laws and existing federal firearms regulation were inadequate to control the flow of these weapons across state lines.
 
 
 33
 Appellants asserted at oral argument, however, that the real purpose of the Act must be to prohibit purely intrastate manufacture, transfer and possession of semiautomatic assault weapons because both the manufacture and transfer of semiautomatic assault weapons designed for interstate commerce is already prohibited by statute. However, we can locate no federal law other than the Act which specifically restricts intraor interstate manufacture, transport or possession of semiautomatic assault weapons. See, e.g., 18 U.S.C. 922. Before this Act was passed, manufacturing, importing, and dealing in "semiautomatic assault weapons" was legal for any licensed importer, licensed manufacturer or licensed dealer of firearms (hereinafter "licensee"). See 18 U.S.C. 922(a)(1). The prior statutory framework of firearms legislation thus left unregulated a wide array of manufacture, transfer and possession of firearms all with undeniable substantial effects on interstate commerce.[6] The interstate activities prohibited solely by the 1994 Act, such as the interstate sale and delivery of semiautomatic weapons between federal licensees, are the type of activities which arise out of or are connected with a commercial transaction, and when viewed in the aggregate substantially affect interstate commerce. See Lopez, 514 U.S. at 561; see also Wickard, 317 U.S. at 128-29. Moreover, since the Act does not apply to the transfer or possession of a weapon otherwise lawfully possessed on the date of the Act's effectiveness, the intrastate possession banned by the Act will virtually always arise out of an illegal manufacture or transfer of a "semi automatic assault weapon". See 18 U.S.C. 922(v)(2).
 
 
 34
 In the final analysis, however, the primary reason why appellants' point about the purpose of the Act is not well taken is because even if the interstate activities regulated by this statute are already prohibited, the intrastate activities regulated by the Act nonetheless have a substantial effect on interstate commerce. The prohibition of the intrastate activities is an "essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." Lopez, 514 U.S. at 561; see also 1 Tribe, 5-4, at 819-20 n.50. The congressional testimony behind the 1994 Act demonstrated that the previous federal firearms regulation scheme and state law were being widely circumvented and were thus inadequate to allow states to control the flow of semiautomatic assault weapons across their borders. Based on the grave dangers posed by such weapons before prior federal and state laws could be enforced, Congress decided that it needed to take the additional step of stifling their manufacture and flow in interstate commerce. These circumstances necessitated a law that would prevent any commercial activity in these particularly dangerous types of guns where it began with the manufacture and interstate transfer, and where it ended with their possession in other states throughout the nation.[7]
 
 
 35
 It may be argued that congressional hearings alone are not sufficient to demonstrate that a statute is directed at regulating interstate commerce, but the Supreme Court's precedent dictates otherwise. In Lopez, the Supreme Court stated that it would consider legislative findings and even congressional committee findings to determine if there was a rational basis for congressional action; the Court in truth did not say whether it would consider congressional hearings. See 514 U.S. at 562. However, there are instances where even though Congress has not made findings about any substantial effect on interstate commerce, the Supreme Court has upheld legislation under the Commerce Clause solely on the basis of congressional hearings. See Heart of Atlanta Motel, Inc. v. United States, 379 U.S. 241, 252-53 (1964); Katzenbach v. McClung, 379 U.S. 294, 299-300 (1964).
 
 
 36
 Both Heart of Atlanta Motel and McClung involved Commerce Clause challenges to the public accommodations provisions of the Civil Rights Act of 1964, which contained no congressional findings. The Court in both cases held, as it did in Lopez, that Congress was not required to make formal findings in order to legislate under the Commerce Clause. See Heart of Atlanta Motel, 379 U.S. at 252; McClung, 379 U.S. at 299, 304; see also Lopez, 514 U.S. at 562 (noting that Congress is normally not required to make formal findings as to the substantial effects that an activity has on interstate commerce). In fact, the Lopez Court cited McClung with approval for this exact proposition. See 514 U.S. at 563. As with the public accommodations provisions of the Civil Rights Act of 1964, the "record" of the Violent Crime Control and Law Enforcement Act's "passage through each house is replete with evidence" of the effect of the prohibited activities on interstate commerce. Heart of Atlanta, 379 U.S. at 252;McClung, 379 U.S. at 299. Therefore, we find that in light of the extensive testimony regarding the interstate flow of semiautomatic assault weapons across state lines, that Congress had a rational basis for regulating the manufacture, transfer and possession of semiautomatic assault weapons as an exercise of the commerce power that substantially affects interstate commerce.
 
 
 37
 Our conclusion that the Act regulates activity which has a substantial effect on interstate commerce is supported not only by testimony before the Congress that enacted it but also by the congressional findings accompanying federal firearms legislation enacted prior to the Act at issue. In 1938, Congress enacted the Federal Firearms Act, which regulated the manufacture and transfer of firearms in interstate commerce, and defined it as "[a]n Act to regulate commerce in firearms." See Pub. L. No. 785, 52 Stat. 1250, 1250. In 1968, Congress passed the Omnibus Crime Control and Safe Streets Act of 1968 ("OCCSSA") and the chapter regulating firearms was titled "State Firearms Control Assistance."Pub. L. No. 90-351, 82 Stat. 197, 225. The OCCSSA contained congressional findings that: "there is a widespread traffic in firearms moving in or otherwise affecting interstate commerce, and ... the existing Federal controls over such traffic do not adequately enable the states to control this traffic within their own borders through the exercise of their police power." 82 Stat. at 225. Congress further found that "the ease with which any person can acquire firearms, ... is a significant factor in the prevalence of lawlessness and violent crime in the United States." See id.[8] These two It is a well-established principle of statutory interpretation that implied repeals should be avoided. See, e.g., Randall v. Loftsgaarden, 478 U.S. 647, 661 (1986) ("repeals by implication are not findings express the widely accepted knowledge that there is a vast interstate market in firearms that makes the states unable to control the flow of firearms across their borders or to prevent the crime inevitably attendant to the possession of such weapons once inside their borders.
 
 
 38
 The congressional findings which accompanied the Gun Control Act of 1968 were even more explicit: "the principal purpose of [the Act] ... is to strengthen Federal controls over interstate and foreign commerce in firearms and to assist the States effectively to regulate firearms traffic within their borders." H.R. Rep. No. 90-1577, at 6 (1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4411. These congressional findings further attest to Congress' concern over a significant interstate commerce in firearms, and the need to regulate possession of firearms to control the unwanted flow of firearms across state lines.
 
 
 39
 The district court here found that 922(v) is sufficiently similar to the subject matter of prior federal firearms legislation to permit the use of earlier findings to demonstrate that the activities regulated by the current Act substantially affect interstate commerce. See Memorandum Order and Opinion, J.A. at 69. Appellants argue that under Lopez, the prohibitory provisions of the Act cannot be supported by legislative findings in previous firearms legislation. In Lopez, the Court refused to import Congressional findings from previous firearms legislation in order to find an interstate nexus for the Gun Free School Zones Act ("GFSZA"). See Lopez, 514 U.S. at 563. The Court said that importing findings from previous law was "especially inappropriate" since previous enactments and findings did not address the subject matter of the ban in dispute, i.e., a ban on guns in a school zone and its relationship to interstate commerce. Rather, the Court concluded, the GFSZA " 'plows thoroughly new ground and represents a sharp break with the long-standing pattern of federal firearms legislation.' " Id. (quoting United States v. Lopez, 2 F.3d 1342, 1366 (5th Cir. 1993)); see also Lopez, 2 F.3d at 1366-67 (noting that the GFSZA is a regulation of schools).
 
 
 40
 True, the Supreme Court's opinion in Lopez does not speak with sharpness or clarity in laying down a test for determining if a statute represents a break with a long-standing pattern of prior legislation. See 514 U.S. at 559. However, the Supreme Court's decision in Maryland v. Wirtz, 392 U.S. 183 (1968), overruled on other grounds by National League of Cities v. Usery, 426 U.S. 833 (1976), overruled by Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528 (1985), is more instructive on this issue. In Wirtz, the Court considered a Commerce Clause challenge to the 1961 amendments to the Fair Labor Standards Act, which had itself been upheld as a valid exercise of the Commerce power in United States v. Darby. See id. at 188 (citing Darby, 312 U.S. 100 (1941)). The provision at issue in Wirtz extended the scope of employees covered by the Act from employees "engaged in commerce or in the production of goods for commerce" which was upheld in Darby, to every employee "employed in an enterprise engaged in commerce or in the production of goods for commerce" even if the particular employee did not work in the enterprise's commercial activity. Id. at 188. The Wirtz Court concluded that the constitutionality of the extended protection was settled by the Court's reasoning in Darby. See id. The Court reasoned that it was irrelevant whether the legislative history of the amendments contained a new finding that the extension affected commerce because "the original Act stated Congress' findings and purposes as of 1938. Subsequent extensions of coverage were presumably based on similar findings and purposes with respect to the areas newly covered." Id. at 190 n.13. Therefore, even though the amendments at issue in Wirtz in some sense "broke new ground," the prior findings were nonetheless held sufficient to support the constitutionality of the new amendments under the Commerce Clause.
 
 
 41
 The extension of federal regulation over "semiautomatic assault weapons" to all manufacture, transfer and possession is in our view, quite similar to the extension of the scope of employees covered by the FLSA in Wirtz. In Wirtz, the subject matter of both the original act and the amendments was employees of manufacturers engaged in interstate commerce. See 392 U.S. at 187. The congressional findings in the original FLSA that sub-par labor conditions in manufacture carried on in one state could cause interstate commerce to be used to spread poor labor conditions among workers in other states, burden the flow of commerce, and constitute an unfair method of competition in interstate commerce served to adequately explain the connection between the labor conditions of the newly-protected employees and interstate commerce. See id. at 190. In this case, the subject matter of both the prior firearms legislation and the present Act is control over the distribution of firearms in a national market. See Scarborough v. United States, 431 U.S. 563, 564 (1977);Huddleston v. United States, 415 U.S. 814, 824 (1974) (holding that the purpose of the OCCSSA and Gun Control Act was to control the "widespread traffic in firearms"). In addition, Congress originally found a connection between the widespread traffic in firearms in interstate commerce, and the purpose of the present Act, i.e., to help states adequately control that traffic across their own borders. See 82 Stat. at 225-26 (1968). This Act merely extends federal control over the distribution of a certain type of firearm to all manufacture, transfer and possession. To the extent that the connection to interstate commerce is not clear from the congressional hearings for the present Act, the congressional findings in prior federal firearms regulation more than adequately demonstrate that connection.
 
 
 42
 The statute at issue in Lopez is clearly distinguishable because it dealt not with federal control over the distribution of firearms, but with federal protection of a discrete geographical zone around a school. The congressional findings behind earlier federal firearms regulation that we have alluded to did not address the subject of gun possession around a school, rather they addressed the widespread flow of weapons across state lines and the inability of state law enforcement to regulate it. Nor did these findings explain how possession in a school zone has any connection to interstate traffic in firearms or the flow of firearms across state lines. Finally, the statute in Lopez was not supported by any extensive congressional testimony addressing problems discussed in congressional findings behind earlier firearms legislation. As a result, the ban on school zone firearm possession, entirely intrastate, could not be justified as necessary to effectuate a larger scheme to control interstate traffic.
 
 
 43
 The use of congressional findings from prior federal firearms legislation to demonstrate the connection between the Act and interstate commerce is supported by the decisions of other circuits upholding the Firearms Owner Protection Act of 1986 ("FOPA"). Courts of appeals have unanimously upheld the FOPA, which makes it unlawful to "transfer or possess a machine gun."[9] 18 U.S.C. 922(o) (1994). The FOPA is not supported by any legislative findings. See United States v. Franklyn, 157 F.3d 90, 95 (2d Cir. 1998);United States v. Rybar, 103 F.3d 273, 279 (3d Cir. 1996).Nonetheless, other circuits have held that the subject matter of FOPA is sufficiently similar to previous firearms legislation to render appropriate the importation of prior legislative findings as a reliable statement of Congress' intent in passing FOPA. See, e.g., Franklyn, 150 F.3d at 95; Rybar, 103 F.3d at 279; Kenney, 91 F.3d at 890; Wilks, 58 F.3d at 1521; see also Knutson, 113 F.3d at 30-31; Beuckelaere, 91 F.3d at 784-85 (not specifically making a finding of similar subject matter but nonetheless relying on congressional findings in prior acts). These cases have distinguished FOPA from the Gun Free School Zone Act in Lopez on the ground that the former does not represent a "sharp break" with the longstanding pattern of federal firearms legislation, but rather a continuation of the design of earlier statutes to regulate the interstate flow of firearms. See Rybar, 103 F.3d at 279;Wilks 58 F.3d at 1521 n.4. That is certainly true of this Act as well, which prohibits a particularly dangerous class of weapons from interstate commerce.
 
 
 44
 B. The Constitutional Attack Under the Bill of Attainder Clause
 
 
 45
 Appellants' argument that 921(a)(30)(viii) and (ix) when combined with 922(v)(1) is an unconstitutional Bill of Attainder is largely disposed of by this court's recent decisions involving the BellSouth Corporation's challenges to provisions of the Telecommunications Act of 1996. See BellSouth Corp. v. FCC, 162 F.3d 678 (D.C. Cir. 1998) ("BellSouth II");BellSouth Corp. v. FCC, 144 F.3d 58 (D.C. Cir. 1998) ("BellSouth I"). BellSouth II defined the framework for modern bill of attainder analysis. Under the current interpretation of the Bill of Attainder Clause, a law is constitutionally impermissible if it both specifically singles out individuals (or businesses) and imposes punishment on them. See BellSouth II, 162 F.3d at 683 (citing United States v. Lovett, 328 U.S. 303, 315 (1946)); see also Nixon v. Administrator of Gen. Serv., 433 U.S. 425, 471-72 (1977) ("the Act's specificity, the fact that it refers to appellant by name does not automatically offend the Bill of Attainder Clause"). Once it is determined that a law identifies its subject with specificity, the next question is whether the statute inflicts punishment as defined by Nixon. See BellSouth II, 162 F.3d at 684. Under Nixon, whether a statute inflicts a "punishment" under the Bill of Attainder Clause depends on
 
 
 46
 (1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, viewed in terms of the type and severity of the burdens imposed, reasonably can be said to furthernon-punitive legislative purposes; and (3) whether the legislative record evinces a congressional intent to pun-ish.
 
 
 47
 See BellSouth II, 162 F.3d at 684 (quoting Nixon, 433 U.S. at 473, 475-76, 478).
 
 
 48
 We need not address the issue of whether the Act applies with specificity,[10] because the Act does not impose punishment on Intratec and Penn Arms as contemplated by the Bill of Attainder Clause in Article I, Section 9 of the Constitution.
 
 
 49
 The historical meaning of legislative punishment includes a death sentence, imprisonment, banishment, confiscation of property and legislative bars to participation by individuals or groups in specific employments or professions. See Nixon, 433 U.S. at 473-74; Selective Serv. Sys. v. Minnesota Pub. Interest Research Group, 468 U.S. 841, 852 (1984). The Act at issue in this case does not condemn appellants to death or imprisonment, but rather specifies certain conduct from which appellants must refrain in order to avoid punishment. Appellants argue that the Act operates as a legislative bar to their participation in specific employments or professions. Appellants claim that the Act prohibits them from the employment or profession of manufacturing "semiautomatic assault weapons."
 
 
 50
 Those cases in which the Supreme Court has struck down statutes which bar specific parties from employment as imposing punishment, however, are different than the present case because all involved situations in which the ban was used as a "mode of punishment ... against those legislatively branded as disloyal." Nixon, 433 U.S. at 474; see United States v. Brown, 381 U.S. 437 (1965) (statute preventing a member of the Communist Party from holding office in a labor union); United States v. Lovett, 328 U.S. 303 (1946) (statute cutting off salary of three named employees based on their membership in the Communist Party); Ex Parte Garland, 71 U.S. 333 (1866) (statute requiring attorneys to take oath that they had not aided the Confederacy before being allowed to practice in federal court); Cummings v. Missouri, 71 U.S. 277 (1866) (state constitution provision barring those who had aided or sympathized with the Confederacy from teaching, holding office, or serving as a trustee for a religious organization). This court in BellSouth I focused on the Supreme Court's opinion in Brown which distinguished a statute making it a crime for a member of the Communist Party to hold a position as an officer in a labor union from section 32 of the Banking Act which prevented members of securities underwriting firms from working for banks that belong to the Federal Reserve System. See BellSouth I, 144 F.3d at 65 (citing Brown, 381 F.3d at 453-55). The court in Brown distinguished the two statutes on the ground that while the former statute " 'inflicted its deprivation upon the members of a group thought to present a threat to the national security' " the latter " 'incorporate[d] no judgment censuring or condemning any man or group of men.' " See BellSouth I, 144 F.3d at 65 (quoting Brown, 381 U.S. at 45354); see also BellSouth II, 162 F.3d at 686 (noting that a law falls within the historical punishment of a bar to employment only where there are concerns that the restrictions it imposes violate fundamental guarantees of political and religious freedom). In this case, the ban on semiautomatic assault weapons raises no concern that Congress is singling out appellants for punishment because they are disloyal or disfavored. Congress has rather singled out certain weapons as dangerous and disproportionately linked to crime. Therefore, the Act's prohibition of the specific weapons manufactured by appellants does not fall within the historical meaning of punishment.
 
 
 51
 Even if a statute does not fall within the historical definition of a punishment, this court must apply the second prong of Nixon, which requires that a nonpunitive legislative purpose is served by the legislation. See BellSouth I, 144 F.3d at 65. The purpose of this requirement is to "prevent Congress from circumventing the clause by cooking up newfangled ways to punish disfavored individuals or groups." Id.This approach recognizes that merely because a regulation is burdensome does not mean that it constitutes punishment. For example, the Supreme Court has upheld a statute prohibiting convicted felons from serving as officers of a waterfront union. See DeVeau v. Braisted, 363 U.S. 144 (1960). The Court reasoned that even though the statute placed a burden on convicted felons, it did not seek to punish them but rather to devise an effective scheme to regulate waterfront criminal activity. Since the goal of the legislative scheme was to improve the integrity of waterfront commerce, exclusion of individuals previously convicted of a felony was a legitimate means to that end. See id. at 160. Similarly, although the Act in this case does place a particular burden on appellants, the legislative history of the Act shows that the intent of the Act was not to inflict punishment on appellants, but rather to reduce the availability of semiautomatic assault weapons, prevent the flow of such weapons into states with laws prohibiting them, and reduce the violent crime disproportionately associated with these types of guns. See H.R. Rep. No. 103-489, at 1-2 (1994). In addition, Congress' inclusion of copies and duplicates of the guns made by appellants, fourteen other guns by name and three broad categories of pistols, rifles and shotguns in the definition of "semiautomatic assault weapon" indicates that it was aiming not to punish appellants, but rather to regulate an entire class of weapons. See 18 U.S.C. 922(a)(30). The text and legislative history of the Act therefore demonstrate that the Act serves a legitimate nonpunitive purpose.
 
 
 52
 The final prong of the Nixon test is whether the legislative record indicates a legislative intent to punish. The case law instructs that under this prong, appellants must show " 'unmistakable evidence of punitive intent.' " See BellSouth I, 144 F.3d at 67 (quoting Selective Serv. Sys., 468 U.S. at 856 n.15. Moreover, isolated statements are not sufficient to show a punitive intent. See Selective Serv. Sys., 468 U.S. at 856 n.15; see also BellSouth I, 144 F.3d at 67 (requiring " 'smoking gun' evidence of congressional vindictiveness" to justify finding punitive intent). Appellants note that in a footnote the House Report summarizing the Act lists all of the semiautomatic weapons that are specifically listed in the statute. See H.R. Rep. No. 103-489, at 20 n.35. Furthermore, appellants point out that they are repeatedly named in the floor debates as the manufacturers of banned weapons.These allegations fall well short of the type of evidence required to show a legislative intent to punish. In BellSouth I, this court held that even a few scattered remarks referring to anti-competitive abuses committed by baby-Bells in the past were insufficient to show the necessary legislative intent to punish. See 144 F.3d at 67. The statements appellants complain of do not rise to the statements in BellSouth I. In BellSouth I, the statement singled out specific bad acts by the party, indicating the possibility that the speaker had found fault with the baby-Bell. Here, the mere mention of appellants' guns in the House Report and their names in the floor debates do not so much suggest an intent to punish as represent mere recitals of the content of the Act itself. This is far from the unmistakable evidence of punitive intent required by the Supreme Court in Selective Serv. Sys. See 468 U.S. at 856 n.15.
 
 
 53
 Therefore, since the prohibition effectuated by the Act neither falls within the historical meaning of punishment, nor exhibits a purely punitive purpose, nor manifests a congressional intent to punish appellants, it does not constitute an unconstitutional Bill of Attainder.[11]
 
 III. Conclusion
 
 54
 We hold that section 110102 of the Violent Crime Control and Law Enforcement Act of 1994 is within Congress' Commerce Clause power and does not constitute an unconstitutional Bill of Attainder. The district court's decision granting the government's motion for summary judgment is therefore
 
 
 55
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 The It ratec TEC-DC9 is simply the the Intratec TEC-9 re-named. See Navegar, Inc. v. United States, 914 F. Supp. 632, 633 (D.D.C. 1996).
 
 
 [2]
 Appellees argued below that the provisions at issue may also be classified as a category 1 regulation of the channels of interstate commerce. The trial judge concluded that it could not. We need not address this issue. Some of our prior cases indicate that some statutes are capable of classification as both a category 1 and category 3 regulation of commerce. See National Ass'n of Home Builders v. Babbitt, 130 F.3d 1041, 1046 (D.C. Cir. 1997). A prime example of the interconnection of categories 1 and 3 is the Lopez Court's citation of United States v. Darby, 312 U.S. 100, 114 (1941), as a category 1 case and Maryland v. Wirtz, 392 U.S. 183, 196, n.27 (1968), for category 3. See 514 U.S. at 558-59. Wirtz involved a challenge to a 1961 amendment to the Fair Labor Standards Act originally challenged in Darby. The amendment extended the coverage of the FLSA from employees "engaged in commerce" to employees "employed in an enterprise engaged in commerce or in the production of goods for commerce." See 392 U.S. at 188. The Supreme Court held that the constitutionality of the 1961 extension of employees covered by the Act was "settled by the reasoning of Darby itself." Id. Therefore Wirtz, the paradigmatic category 3 case according to Lopez, is in fact a category 1 case as well. The confluence of categories 1 and 3 demonstrates that while the categories are useful as a synopsis of the Supreme Court's Commerce Clause jurisprudence, the attempt to fit a regulation squarely within one category can prove elusive, even fruitless.
 
 
 [3]
 The confluence of Lopez categories 1 and 3 is also apparent from the cases where other circuits have upheld the Firearm Owners Protection Act of 1986, ("FOPA"), which makes it unlawful to "transfer or possess a machine gun." 18 U.S.C. 922(o) (1994). FOPA has been upheld as a Lopez category 3 regulation of an activity with a substantial effect on interstate commerce by the Second, Third, Fifth, Seventh, Tenth and Eleventh Circuits. See United States v. Franklyn, 150 F.3d 90, 96 & n.3 (2d Cir. 1998) (not deciding whether FOPA fell within Lopez category 1); United States v. Wright, 117 F.3d 1265, 1270 (11th Cir. 1997), vacated on other grounds, 133 F.3d 1412 (1998); United States v. Knutson, 113 F.3d 27, 30 (5th Cir. 1997) (avoiding the issue of category 1 to prevent controversy); United States v. Rybar, 103 F.3d 273, 283 (3d Cir. 1996); United States v. Kenney, 91 F.3d 884, 890 (7th Cir. 1996); United States v. Wilks, 58 F.3d 1518, 1521 (10th Cir. 1995). The FOPA has been upheld as a Lopez category 1 regulation of the channels of interstate commerce by the Sixth and Ninth Circuits. See United States v. Beuckelaere, 91 F.3d 781, 783 (6th Cir. 1996); United States v. Rambo, 74 F.3d 948, 952 (9th Cir. 1995); see also United States v. Kirk, 70 F.3d 791, 796-97 (5th Cir. 1996), vacated, 78 F.3d 160 (1996). Likewise, the First Circuit has upheld under Lopez category 3 section 110201 of the Violent Crime Control and Law Enforcement Act, entitled the Youth Handgun Safety Act, which prohibits the mere possession of a firearm by a juvenile. See United States v. Cardoza, 129 F.3d 6, 12 (1st Cir. 1997); 108 Stat.
 1796, 2010 (codified at 18 U.S.C. 922(x) (1994)).
 
 
 [4]
 Congress heard other testimony regarding specific crimes where the assailant subverted state laws by buying a semiautomatic assault weapon in one state and using it to commit a crime in another where it was prohibited. See id. at 246 (statement of Catherine Varner); Assault Weapons: A View From the Front Lines: Hearing Before Senate Committee on the Judiciary, 103d Cong. 38 (1994) (Statement of Sarah Brady, chair of Handgun Control Int'l).
 
 
 [5]
 Congress also heard testimony from state and federal lawmakers regarding the necessity of a national ban on semiautomatic assault weapons because existing state and federal regulation were insufficient. Jim Florio, at that time Governor of New Jersey, testified that "no individual state law, no matter how strong, can stop the deadly flow of these weapons across State lines." Assault Weapons: A View From the Front Lines: Hearing Before Senate Committee on the Judiciary, 103d Cong. 22 (1994) (also noting that the day a New Jersey statewide ban on assault weapons took effect, a man with an assault weapon obtained from Florida took a mother and her two children hostage, murdered the mother and shot her daughter 14 times). Then-Representative Charles Schumer testified before the Senate Judiciary Committee that "[o]ne city or state simply can't control the flow of weapons. They just go buy them in another state. We need a national ban." Id. at 7; see also id. at 11 (statement of Senator Diane Feinstein) (stating that "without a national ban on these weapons ... state and local initiatives are meaningless. Lenient laws allow gun buyers ... to simply cross state lines and purchase their weapons of choice.").
 
 
 [6]
 While 922(b)(3) prohibits a licensee from selling or delivering a firearm to an unlicensed transferee whom the licensee knows or has reasonable cause to know does not reside in the state of the licensee's place of business ("LPOB"), it allows a licensee to (a) sell or deliver any rifle or shotgun to a resident of a state other than the state of the LPOB if the transferring parties meet in person to effectuate the transfer, and the sale, delivery and receipt comply with legal conditions of sale in both the state of residence of the transferee and place of business of the transferor and (b) to loan or rent a firearm to any person for temporary use for lawful sporting purposes.
 Further, 922(a)(3) allows any licensee to transport or deliver any firearm obtained outside her state into her state. See id. 922(a)(3). Persons without a license cannot transport weapons in that fashion except for lawful receipt out-of-state through intestate succession or bequest or the transportation or receipt of any rifle or shotgun sold or delivered to her under 922(b)(3). See id. 922(a)(3)(A), (B). In addition, any unlicensed person is prohibited from transferring any firearm to any person whom the transferor knows or has reason to believe does not reside in her state except for (a) the transport, transfer or delivery of a firearm pursuant to a bequest or intestate succession and (b) the loan or rental of a firearm to another for temporary use for lawful sporting purposes. See id. 922(a)(5). Finally, any person not otherwise prohibited from transporting, shipping or receiving a firearm may transport a firearm for any lawful purpose from any place where she may lawfully possess such firearm to any other place where she may lawfully possess such firearm so long as during such transportation, the firearm is unloaded and neither the firearm nor ammunition is accessible from the passenger compartment of the transporting vehicle. See id. 926A.
 Many activities affecting interstate commerce which would be prohibited under the Act in dispute here are not covered by the firearms regulation framework existing before the Act. For example, a licensee could otherwise buy, receive, sell or deliver in interstate commerce any "semiautomatic assault weapon" to or from a fellow licensee. See id. §§ 922(a), (b). A licensee could sell or deliver any rifle or shotgun, including the Penn Arms Striker 12 or any semiautomatic rifle or shotgun under the definition of 921(a)(30)(B) or (D) to any transferee whom the licensee has reason to know resides in another state that does not prohibit the weapon. See id. 922(b)(3). In turn, the transferee could then transport that weapon into any other state which does not prohibit that weapon. See id. 926A. In addition, any licensee could sell any type of "semiautomatic assault weapon" to another person residing in his state, even if for the express purpose of the buyer using it interstate. See id. §§ 922(a)(3), 926A. The buyer could then transport it to any other state which does not prohibit the weapon. See id. §§ 922(a)(3), 926A. In addition, a person from any state could loan or rent a "semiautomatic assault weapon" for temporary use in lawful sporting activities in another state. See id. §§ 922(a)(5)(B), (b)(3)(B).
 
 
 [7]
 While it may be argued that the statute sweeps too broadly by prohibiting "purely" intrastate transfers or possession of "semiautomatic assault weapons," the Supreme Court has made clear that "where the class of activities is regulated and that class is within the reach of federal power, the courts have no power 'to excise, as trivial, individual instances' of the class." Perez v. United States, 402 U.S. 146, 154 (1971) (quoting Maryland v. Wirtz, 392 U.S. at 193); see also 1 Tribe, 5-5, at 831 n.27 (noting that if a gun was manufactured in one state and happened to be purchased by the ultimate buyer in that same state, the purchase can "affect" interstate commerce, even though it was intrastate in this one instance, in the same way that the farmer's consumption of his home-grown wheat did in Wickard).
 
 
 [8]
 Appellants claim that the Gun Control Act of 1968 superseded and impliedly repeals these findings from the OCCSSA because the findings were not contained in the later Act. However, the House Report accompanying the Gun Control Act states that the Act "builds substantially on the regulatory framework contained in title IV of the Omnibus Crime Control and Safe Streets Act of 1968" and makes three major additions. See H.R. Rep. No. 90-1577, at 7 (1968), reprinted in 1968 U.S.C.C.A.N. 4410, 4413. Since the Gun Control Act was merely extending the OCCSSA, the congressional findings were omitted as unnecessary. See id. at 5. The report does not make any reference to the Gun Control Act repealing or superseding any part of the OCCSSA. favored"). Courts have "seldom, if ever, held that a federal statute is impliedly repealed," and will only find such a repeal when two statutes are in "irreconcilable conflict." See Matsushita Elec. Indus. Co. v. Epstein, 516 U.S. 367, 381 (1996). Furthermore, this court has noted that the reason for the rule is that Congress is normally expected to be aware of its previous enactments and to provide clear statement of repeal if it intends to do so. See Samuels v. District of Columbia, 770 F.2d 184, 194 n.7 (citing TVA v. Hill, 437 U.S. 153, 189-93 (1978)). This rationale is particularly applicable here, where the two laws at issue were passed four months apart and the legislative history of the second Act specifically discusses the first Act. See H.R. Rep. No. 90-1577, at 6-7. The legislative report shows that not only was Congress aware of the Omnibus Act, it also did not intend to repeal the Omnibus Act's congressional findings.
 
 
 [9]
 The Second, Third, Fifth, Sixth, Seventh, Ninth, Tenth and Eleventh Circuits have all upheld the FOPA against post-Lopez Commerce Clause challenges. In each case, the court upheld the defendant's conviction for possession of a machine gun. In addition, the First Circuit has upheld a similar statute banning possession of firearms by juveniles. See supra, note 3.
 
 
 [10]
 Indeed, the fact that §§ 921(a)(30)(A)(viii) and (ix) name not only the guns produced by appellants but also any copies or duplicates of those firearms, raises a question of whether or not the Act specifically applies to appellants. Moreover, the fact that the definition of "semiautomatic assault weapons" includes fourteen other firearms by name as well as three broad categories of pistols, rifles and shotguns is evidence that Congress was not singling out appellants, but rather aiming to prohibit an entire class of weapons.
 
 
 [11]
 Finally, appellants argue that the BellSouth cases and the Nixon test should be inapposite here because the statute at issue imposes a criminal penalty whereas the statutes in BellSouth, Nixon and previous Bill of Attainder cases did not. See Appellants' Reply Br., at 19-20. However, appellants are unable to point to any authority nor give a rational justification for this distinction. Rather, appellants argue that since the Act imposes a criminal penalty, it automatically satisfies the punishment requirement of a bill of attainder. Yet nowhere in Nixon or the cases subsequent to it is there indication that the Nixon test doesn't apply to a statute that imposes criminal penalties. Furthermore, appellants' argument is disproved by United States v. Brown, 381 U.S. 437 (1965), which also involved a statute imposing a criminal penalty. See id. at 438. In Brown, the Court applied the same factors as Nixon when it inquired into the question of punishment by first considering the historical gloss on the meaning of punishment, and next determining whether the purpose of the Act was punitive or nonpunitive. See id. at 458-59. The Court's analysis in Brown demonstrates that the factors used in the Nixon test for punishment under the Bill of Attainder Clause apply with equal force to both civil and criminal statutes. Indeed, the mere fact that Nixon cites Brown as determining whether punitive or nonpunitive objectives underlie a law is strong evidence that the Nixon Court did not believe that a different test applied to a statute which imposed a criminal penalty, as was the case in Brown. See 433 U.S. at 475-76 n.40.