Olympic ARMS; Calico Light Weapons Systems; D.C. Engineering, Inc.; Ammo Dump; and Glenn Duncan, Plaintiffs,

v.

John W. MAGAW, Director, Bureau of Alcohol, Tobacco and Firearms; and United States of America, Defendants.

No. 95–CV–76357–DT.

United States District Court, E.D. Michigan, Southern Division.

March 31, 2000.

Gerald W. Pergande, Pergande & Bleau, Bay City, James H. Warner, Assistant General Counsel, National Rifle Association, Fairfax, VA, David Hardy, Tucson, AZ, David M. McCleary, Lansing, for plaintiffs.

Frank W. Hunger, Assistant Attorney General, Saul A. Green, United States Attorney, Michael Hluchaniuk, Assistant United States Attorney, Dennis G. Linder, Director, Federal Programs Branch, Sandra M. Schraibman, Andrea Newmark, Martha E. Rubio, Washington, D.C., Patricia Milgram, Bureau of Alcohol, Tobacco and Firearms, Office of the Chief Counsel, Washington, D.C., of counsel, for defendants.

*ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT*

CLELAND, District Judge.

## I. Background

### A. The Statute at Issue

Plaintiffs filed this lawsuit in February 1995, challenging the constitutionality of Title XI of the Violent Crime Control and Law Enforcement Act of 1994, Pub.L. No. 103–322, 108 Stat. 1796 (1994) ("Crime Control Act" or "Semiautomatic Assault Weapons Ban" or "the ban"). The Crime Control Act amended the Gun Control Act of 1968, 18 U.S.C. §§ 921–930 ("Gun Control Act"). The 1994 Amendments, which went into effect September 13, 1994, make criminal for a ten-year period a future "manufacture, transfer, or possess[ion] of semiautomatic assault weapon[s]," 18 U.S.C. § 922(v)(1), and "transfer or possess[ion][of] large capacity ammunition feeding device[s]." 18 U.S.C. § 922(w)(1).

Congress defined a "semiautomatic assault weapon" in 18 U.S.C. § 921(a)(30):

(A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as—

(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

(ii) Action Arms Israeli Military Industries UZI and Galil;

(iii) Beretta Ar70 (SC–70);

(iv) Colt AR–15;

(v) Fabrique National FN/FAL, FN/LAR, and FNC;

(vi) SWD M–10, M–11, M–11/9, and M–12;

(vii) Steyr AUG;

(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of—

(i) a folding or telescopic stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a bayonet mount;

(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

(v) a grenade launcher;

(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of—

(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

(v) a semiautomatic version of an automatic firearm; and

(D) a semiautomatic shotgun that has at least 2 of—

(i) a folding or telescopic stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a fixed magazine capacity in excess of 5 rounds; and

(iv) an ability to accept a detachable magazine.

18 U.S.C. § 921(a)(30).

Congress defined a "large capacity ammunition feeding device" in 18 U.S.C. § 921(a)(31):

(A) [ ] a magazine, belt, drum, feed strip, or similar device manufactured after the date of enactment of the Violent Crime Control and Law Enforcement Act of 1994 that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; but

(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

18 U.S.C. § 921(a)(31).

## B. Procedural History

This court dismissed plaintiffs' case based on standing and ripeness issues.

*National Rifle Ass'n v. Magaw,* 909 F.Supp. 490 (E.D.Mich.1995); *see also* (Def. Br. at 3; Def. Mot. at 1.) Plaintiffs appealed. The Sixth Circuit affirmed in part and reversed in part, sustaining the dismissal of the individual and organizational plaintiffs, but holding that those plaintiffs who were federally licensed firearms manufacturers and dealers had standing to assert their Commerce Clause and equal protection challenges. *National Rifle Ass'n v. Magaw,* 132 F.3d 272, 295 (6th Cir.1997). Accordingly, Olympic Arms, Calico Light Weapons Systems, D.C. Engineering, Ammo Dump, and Glenn Duncan remain in the case [1] because they "suffered economic harm from the impact of the passage of the Act, which has restricted the operation of their businesses in various ways—either forcing them to 'stop production,' 'decline work,' and to 'refrain from sales and marketing,' or imposing the need to redesign and relabel products." *Id.* at 281; *see also* (Def. Br. at 4.) The individual plaintiffs and non-profit gun rights associations do not have standing to sue because they suffered no economic harm, *National Rifle Ass'n,* 132 F.3d at 293, and failed to allege any "injury-in-fact sufficient to confer standing." *Id.* at 295.

In July 1998, defendants moved for summary judgment. Plaintiffs collectively responded and simultaneously filed a cross-motion for summary judgment. Additionally, plaintiff Glen Duncan individually filed a response and cross-motion for summary judgment (the "Duncan Brief") which included discussion of the Second Amendment. The court struck the "Duncan Brief" in an order filed August 9, 1999. *See, infra,* pp. 1070–71. Accordingly, only the Commerce Clause claim and the equal protection claim remain in the cross-motions for summary judgment.

## II. Standard

Under Rule 56, summary judgment is proper when there is no genuine issue as

---

**1.** As noted by the court of appeals, "[t]wo of the original plaintiffs—Navegar, Inc., doing business as Intratec, a Florida corporation, and Thomas L. Heritier—did not join in the appeal." *National Rifle Ass'n,* 132 F.3d at 277 n. 1.

to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. Pro. 56(c). "Where the moving party has carried its burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record construed favorably to the non-moving party, do not raise a genuine issue of material fact for trial, entry of summary judgment is appropriate." *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir.1987) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Summary judgment is not appropriate when "the evidence presents a sufficient disagreement to require submission to a jury." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The existence of some factual dispute does not defeat a properly supported motion for summary judgment; the disputed factual issue must be material.

The burden placed upon the movant for summary judgment is to show that the non-moving party has failed to establish an essential element of its case upon which the non-moving party would bear the ultimate burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322, 106 S.Ct. 2548. But the moving party need not support its motion with affidavits or other similar materials "negating" the opponent's claim. *Id.* at 323, 106 S.Ct. 2548. Once the moving party meets this burden, the burden passes to the non-moving party to establish, after an adequate opportunity for discovery, the existence of a disputed factual element necessary to its case with respect to which it bears the burden of proof. *Id.* The non-moving party must show that there is sufficient evidence for a jury to return a verdict in its favor, *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir.1989) (citation omitted), that is, that there is doubt as to the material facts and

that the record, taken as a whole, does not lead to a judgment for the movant. *Id.* at 1478 (citation omitted). The non-moving party must present affirmative evidence on critical issues. *Id.* at 1477.

### III. Commerce Clause

Plaintiffs' complaint contends that the semiautomatic assault weapons ban exceeds Congress' power under the Commerce Clause because "[t]he possession and intrastate manufacture and transfer [of 'assault weapons'], neither is in, nor does it substantially affect, commerce between the States." (Sec. Amend. Compl. at 5.) Plaintiffs further contend that regulation of "semiautomatic firearms, and large capacity ammunition feeding devices is an area of law which has historically been reserved to the states," (*id.* at 6), and that the possession and manufacture, within the State of Michigan, of the devices addressed by the regulation would not have "any substantial effect upon commerce among the several States." *Id.*

In *United States v. Lopez*, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), the Supreme Court described "three broad categories of activity that Congress may regulate under its commerce power." *Lopez*, 514 U.S. at 558, 115 S.Ct. 1624:

> First, Congress may regulate the use of the channels of interstate commerce.... Second, Congress is empowered to regulate and protect the instrumentalities of interstate commerce, or persons or things in interstate commerce, even though the threat may come only from intrastate activities.... Finally, Congress' commerce authority includes the power to regulate those activities having a substantial relation to interstate commerce ... i.e., those activities that substantially affect interstate commerce.

*Id.* at 558–59, 115 S.Ct. 1624(citations omitted).[2]

---

**2.** In *Lopez*, the Court "quickly disposed of" the first two categories as they pertained to the statute in question, 18 U.S.C. § 922(q). *Lopez*, 514 U.S. at 559, 115 S.Ct. 1624; *see*

*also United States v. Beuckelaere*, 91 F.3d 781, 783 (6th Cir.1996) (discussing *Lopez*). The Court so decided because " § 922(q) [was] not a regulation of the use of the channels of

Accordingly, the issue before the court is whether § 922(v)(1) and 922(w)(1) fit within one of the three categories of Congress' power to regulate under the Commerce Clause. This precise issue was recently and thoroughly addressed by the District of Columbia Circuit in *Navegar, Inc. v. United States,* 192 F.3d 1050 (D.C.Cir.1999). In *Navegar,* the manufacturer of TEC–DC9 [3] and TEC–22 semiautomatic pistols and the manufacturer of various models of Striker 12 revolving cylinder shotguns—which are weapons specifically listed in § 921(a)(30)(A)—brought a lawsuit challenging the constitutionality of § 922(v).[4] *Id.* at 1053.

In *Navegar,* the D.C. Circuit determined that it need not analyze either the first or second *Lopez* categories "because the Act readily falls within category [three] as a regulation of activities having a substantial affect on interstate commerce." *Navegar,* 192 F.3d at 1055. In its discussion of *Lopez* category three, the *Navegar* court addressed each of the three activities banned by § 922(v)(1)—manufacture, transfer, and possession.

As to manufacture, *Navegar* concisely explains that "[t]he Supreme Court has repeatedly held that the manufacture of goods which may ultimately never leave the state can still be activity which substantially affects interstate commerce." *Navegar,* 192 F.3d at 1057–58 (citing *United States v. Darby,* 312 U.S. 100, 118–19, 61 S.Ct. 451, 85 L.Ed. 609 (1941); *NLRB v. Jones & Laughlin Steel,* 301 U.S. 1, 37, 57 S.Ct. 615, 81 L.Ed. 893 (1937)). Re-

garding transfer, *Navegar* succinctly reports that "Supreme Court precedent makes clear that the transfer of goods, even as part of an intrastate transaction, can be an activity which substantially affects interstate commerce." *Id.* at 1058 (citing *Lopez,* 514 U.S. at 560–61, 115 S.Ct. 1624 (citing *Wickard v. Filburn,* 317 U.S. 111, 127–28, 63 S.Ct. 82, 87 L.Ed. 122 (1942)); *Wickard,* 317 U.S. at 114, 63 S.Ct. 82). Accordingly, the *Navegar* court reached the conclusion that "it is not even arguable that the manufacture and transfer of 'semiautomatic assault weapons' for a national market cannot be regulated as activity substantially affecting interstate commerce." *Navegar,* 192 F.3d at 1058.

As to the constitutionality of the third activity regulated under the semiautomatic assault weapons ban—possession—the *Navegar* court entertained the question at length, but ultimately decided that possession, like manufacture and transfer, can be validly regulated as an "exercise of the commerce power that substantially affects interstate commerce." *Navegar,* 192 F.3d at 1062. To this end, the D.C. Circuit observed that "[t]he ban on possession is a measure intended to reduce the demand for 'semiautomatic assault weapons,'" whereas "[t]he restriction on the manufacture and transfer of [semiautomatic assault weapons] is an attempt to restrict the supply of such weapons in interstate commerce." *Id.* at 1058–59. Moreover, the D.C. Circuit explained that banning possession of semiautomatic assault weapons "is necessary to allow law enforcement to

---

interstate commerce, nor [was] it an attempt to prohibit the interstate transportation of a commodity through the channels of commerce; nor [could] § 922(q) be justified as a regulation by which Congress [had] sought to protect an instrumentality of interstate commerce or a thing in interstate commerce." *Lopez,* 514 U.S. at 559, 115 S.Ct. 1624. Moreover, in a lengthier analysis, the court disposed of the third category because, among other things, "[s]ection 922(q) [was] a criminal statute that by its terms [had] nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez,* 514 U.S. at 560, 115

S.Ct. 1624; *see also Beuckelaere,* 91 F.3d at 783 (discussing *Lopez* ).

**3.** As noted by the *Navegar* court, "the Intratec TEC–DC9 is simply the [] Intratec TEC–9 renamed." *Navegar,* 192 F.3d at 1053 n. 1.

**4.** The *Navegar* plaintiffs challenged only § 922(v). However, the *Navegar* court's decision is equally applicable to § 922(w), and this court will not distinguish between the two sections for purposes of determining *Navegar's* applicability.

effectively regulate the manufacture and transfers where the product comes to rest, in the possession of the receiver." *Id.* at 1059.

Accordingly, the D.C. Circuit held, as a matter of law, that § 922(v)(1)[5] falls within the third *Lopez* category and is a valid exercise of Congress' authority under the Commerce Clause. This court will hold likewise.

Although the Sixth Circuit has not specifically ruled on the constitutionality of the semiautomatic assault weapons ban, it has ruled on the constitutionality of the comparable "machinegun ban," 18 U.S.C. § 922(o)(1). *United States v. Beuckelaere*, 91 F.3d 781 (6th Cir.1996). Applying *Beuckelaere* by analogy, it appears the Sixth Circuit would probably find even broader congressional power to regulate under the Commerce Clause than did the D.C. Circuit, and hold that the semiautomatic assault weapons ban falls within the first two *Lopez* categories, as well as the third.

The machinegun ban makes it unlawful to "transfer or possess" a machinegun. 18 U.S.C. § 922(1). In *Beuckelaere*, after receiving a tip from the defendant's brother, police searched the defendant's home and seized four "machineguns." The defendant plead guilty. On appeal, however, the defendant argued that the ban on machineguns "exceed[ed] Congress' power to legislate under the Commerce Clause under the standard established by the Supreme Court in [*Lopez* ]." *Beuckelaere*, 91 F.3d at 782. The Sixth Circuit agreed with the Fifth, Tenth, and Ninth Circuits in deciding that the ban on machineguns "represents a permissible exercise of the authority granted to Congress under the Commerce Clause," *id.*, and determined that the machinegun ban fell within all three *Lopez* categories.

As to the first *Lopez* category, the *Beuckelaere* court explained that the machinegun ban "regulates the 'extensive, intricate, and definitely national market for machineguns' by prohibiting the transfer and possession of machineguns ... [and that] illegal possession of a machinegun cannot occur without an illegal transfer, which given the national marketplace for machineguns, involves the channels of interstate commerce." *Beuckelaere*, 91 F.3d at 784 (internal citation omitted) (discussing *United States v. Rambo*, 74 F.3d 948 (9th Cir.1996)).

As to the second *Lopez* category, the Sixth Circuit found simply that "machineguns are 'things in interstate commerce' which flow across state lines for profit by business entities and hamper local and state law enforcement efforts." *Beuckelaere*, 91 F.3d at 785. The court bolstered its finding by comparing the trafficking of machineguns to the trafficking of narcotics. *Id.*

In explaining why the machinegun ban fell within the third *Lopez* category, the Sixth Circuit noted that "[c]ongressional findings indicate that intrastate possession, distribution and sale of firearms directly and injuriously affects the introduction of them into other states to the injury of the public health and welfare" and that "Congress could have rationally concluded that the link between the violence caused by machineguns and the consequent negative commercial effects was substantial." *Beuckelaere*, 91 F.3d at 785. The Sixth Circuit also explained as follows:

Although mere possession of a machinegun by a defendant, in and of itself, may have minimal impact on interstate commerce, the transfer of machineguns in interstate commerce, combined with the possession and transfer of those firearms intrastate, has a substantial im-

---

5. The *Navegar* court's holding specifically refers to the regulation's statutory designation— "section 110102 of the Violent Crime Control and Law Enforcement Act of 1994"—rather than its codified designation, § 922(v)(1).

*Navegar*, 192 F.3d at 1068. Additionally, as noted earlier, *Navegar's* analysis is equally applicable to both § 922(v)(1) and § 922(w)(1).

pact. Regulation of purely intrastate activity is constitutional when such activity has a substantial affect on interstate commerce.

*Id.* at 786 (citations omitted).[6]

■ Plaintiffs make various attempts to distinguish the semiautomatic assault weapons ban from the machinegun ban. For example, plaintiffs note that § 922(*o*) regulates only the transfer and possession of machineguns, while § 922(u) and (v) regulate the transfer, possession and *manufacture* of semiautomatic assault weapons and high capacity feeders.[7] Plaintiffs' arguments are unpersuasive. While this court cannot predict with certainty how the Sixth Circuit would decide this case, based on the similarities between the machinegun ban and the semiautomatic assault weapons ban—especially in how they relate to interstate commerce—it seems likely that the Sixth Circuit would find that the semiautomatic assault weapons ban, in some measure, falls within Congress' power under the Commerce Clause. Based upon that supposition, it appears the Sixth Circuit's position is consistent (or at least not inconsistent) with the D.C. Circuit's position in *Navegar.* Hence, this court relies on *Navegar*'s thorough analysis. As previously discussed, *Navegar,* holds that the semiautomatic assault weapons ban falls within the third *Lopez* category and is a valid exercise of Congress' Commerce Clause power. Therefore, this court finds that § 922(v)(1) and (w)(1) fall within the third *Lopez* category.

Accordingly, because there is no genuine issue of material fact as to whether 18 U.S.C. § 922(v)(1) and (w)(1) fall within the third *Lopez* category, summary judgment will be granted in defendants' favor on the Commerce Clause claim.

## IV. Equal Protection

■ Equal protection principles apply to both federal and state governments, although for different reasons. The Fourteenth Amendment's Equal Protection Clause, which declares that no State shall "deny to any person within its jurisdiction the equal protection of the laws," U.S. Const. amend XIV, § 1, applies only to state and local governments. The constitution contains no explicit requirement that the federal government provide equal protection of the laws. 3 Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law* § 18.1 (2d ed.1992). Nevertheless, if the federal government acts in a manner that would violate the Fourteenth Amendments' Equal Protection Clause, such action will be deemed a violation of the "implied equal protection guarantee" of the Fifth Amendment's due process clause.[8] *Id.* Accordingly, state and

---

**6.** It appears the regulation of possession of a firearm is limited to its relation to transfer and manufacture, *see supra* p. 1068, as the Supreme Court determined in *Lopez* that mere possession of a firearm in a particular location (a school zone) was too attenuated from interstate commerce to fall within Congress' Commerce Clause power. *Lopez,* 514 U.S. at 560–61, 115 S.Ct. 1624

**7.** As discussed earlier, however, the manufacture of semiautomatic assault weapons falls within Congress' power under the Commerce Clause. *See Navegar,* 192 F.3d at 1057. Although early cases and commentary regarding the Commerce Clause held manufacturing to be outside Congress' grasp, recent cases recognize broader congressional power. The D.C. Circuit, for example, explained as follows:

Today few would agree with Justice Story's claim that the "power to regulate manufacturers" falls outside Congress' Commerce Clause power. Indeed, the *Lopez* Court clearly established the principle that where activity, including manufacturing activity, "substantially affects interstate commerce, legislation regulating that activity will be sustained."

*National Ass'n of Home Builders v. Babbitt,* 130 F.3d 1041, 1057 n. 21 (C.A.D.C. 1997)(citing *Lopez,* 514 U.S. at 560, 115 S.Ct. 1624).

**8.** There appears to be no textual support in the Constitution itself, nor in its historical context, for the conclusion that action by the federal government (as opposed to that of the states) that denies a person "equal protection of the laws" is prohibited by the Fifth Amendment. Rather, it appears to be a judicial

federal laws are examined under the same equal protection standards. *Id.*

### A. Equal Protection Classifications

 Equal protection principles are violated when the government treats differently people who are alike. *See Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 531 (6th Cir.1998). In other words, the government may not inappropriately classify people. In this case a significant question exists as to whether the semiautomatic assault weapons ban even creates classifications of people, as opposed to things. After all, equal protection principles function by "keep[ing] governmental decision makers from treating differently *persons* who are in all relevant respects alike.'" *Id.* (emphasis added).

Courts have addressed this issue as it pertains to the regulation of firearms. For example, the Supreme Court of Connecticut decided that state statutes which banned "the sale, transfer or possession of assault weapons," *Benjamin v. Bailey,* 234 Conn. 455, 662 A.2d 1226 (1995), did not violate equal protection principles because "[t]he plaintiffs' challenge relat[ed] to classifications among weapons, not persons."[9] *Id.; see also United States Postal Serv. v. Brennan,* 574 F.2d 712, (2nd Cir.1978)(determining that distinguishing between letter mail and non-letter mail was not invidious).

 This court finds the analysis of the Supreme Court of Connecticut persuasive. The statutory language of the semiautomatic assault weapons ban does not facially create classifications of people. Nor is there any evidence suggesting that Congress "targeted" these particular manufacturers and dealers in passing the ban. Rather, the adverse effects experienced by these plaintiffs appear incidental to the lawful congressional objective of regulating this field of commerce. That a statute incidentally affects some people more than others does not, by itself, create classifications for review or evince an invidiously discriminatory purpose. Hence, summary judgment is appropriate against plaintiffs for this reason alone. Nevertheless, for purposes of further analysis, the court will assume *arguendo* that the semiautomatic assault weapons ban does create classifications—*i.e.* manufacturers and dealers whose businesses were affected by the legislation and manufacturers and dealers whose businesses were not so affected—for purposes of reviewing the semiautomatic assault weapons ban under equal protection principles.[10]

### B. Applicable Standard of Review

 Once it is determined that a statute creates classifications, a court must determine the nature of the rights and

creation. *See Bolling v. Sharpe,* 347 U.S. 497, 499–500, 74 S.Ct. 693, 98 L.Ed. 884 (1954)(explaining that "[t]he Fifth Amendment, which is applicable to the District of Columbia, does not contain an equal protection clause as does the Fourteenth Amendment which applies only to the states," but nevertheless holding that "racial segregation in the public schools of the District of Columbia is a denial of the due process of law guaranteed by the Fifth Amendment to the Constitution.")

**9.** At least one court has reached a different conclusion on this issue. The California Court of Appeals disagreed with the *Benjamin* court, explaining that "it is the persons who make and own the guns who are penalized."

*Kasler v. Lungren,* 61 Cal.App.4th 1237, 72 Cal.Rptr.2d 260 (1998), *petition for review granted,* 74 Cal.Rptr.2d 824, 955 P.2d 450 (1998). This court notes that the Supreme Court of California granted a petition to review *Kasler* and that, under California guidelines, the case should not be cited.

**10.** The court further notes that the Connecticut Supreme Court in *Benjamin* relied in part on the fact that the state statute restricted firearms by name and not by generic features. *Benjamin,* 234 Conn. at 472, 662 A.2d 1226. The federal semiautomatic assault weapons ban uses both a list method and a generic features method. This distinction further inclines the court to find that additional analysis is warranted.

classifications involved. As explained by the Sixth Circuit, "[w]hen a statute or ordinance uniquely impacts adversely a suspect class or invades a fundamental right, the rigorous strict scrutiny standard will apply, but when it does not the ordinance is tested under the rational relationship standard." *Mount Elliott Cemetery Ass'n*, 171 F.3d 398, 406 (6th Cir.1999)(citing *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985)); *see also Mixon v. State of Ohio*, 193 F.3d 389, 402 (6th Cir. 1999).

 During the most recent round of motions, plaintiffs (at least plaintiff Glen Duncan) argued that the Second Amendment guarantees rights which are applicable to the instant case and intimated that those rights should be considered fundamental rights under an equal protection analysis. Hence, according to plaintiffs, the semiautomatic assault weapons ban should be reviewed under strict scrutiny. Regardless of the potential historical merits of plaintiffs' position, this court must hold to the contrary. As this court noted in its Order Striking the "Duncan Brief," under current interpretations of the law there is probably no Second Amendment right to be a firearms manufacturer or dealer. *See United States v. King*, 532 F.2d 505, 510 (5th Cir.) *cert. denied*, 429 U.S. 960, 97 S.Ct. 384, 50 L.Ed.2d 327 (1976); *Gilbert Equip. Co. v. Higgins*, 709 F.Supp. 1071, 1091 (S.D.Ala.1989). Nor, under the currently controlling authority in this circuit, is there an individual right to bear arms.[11] *See Stevens v. United*

*States*, 440 F.2d 144, 149 (6th Cir.1971), *disapproved on other grounds by* United States v. Bass, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United States v. Warin*, 530 F.2d 103, 106 (6th Cir.1976). Hence, plaintiffs have not proffered an argument sustainable in this circuit that their fundamental rights, or the fundamental rights of their buyers, have been invaded by the semiautomatic assault weapons ban. Nor have they argued that they, as a specific group of firearms manufacturers and dealers, are a suspect class that has been impacted—and one is hard-pressed to imagine how they could be. Accordingly, the semiautomatic assault weapons ban will be reviewed under the "rational relationship" standard.

### C. Rational Relationship

 Under the rational relationship standard, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate [governmental] interest." *Cleburne*, 473 U.S. at 440, 105 S.Ct. 3249 (citations omitted). Wide latitude is afforded social and economic legislation. *Id.* Moreover, under rational relationship review, "the Constitution presumes that even improvident decisions will eventually be rectified by the democratic process."[12] *Id.* However, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *Id.* at 446, 105 S.Ct. 3249.

---

11. At least one other court, after analyzing the issue at length, has held that there is an individual right to bear arms. *See, e.g. United States v. Emerson*, 46 F.Supp.2d 598 (N.D.Texas 1999).

12. Although decidedly indulgent, the rational relationship standard of review still has bite. For example, in the dissenting opinion of *Nordlinger v. Hahn*, Justice Stevens cited numerous tax cases in which the Court invalidated tax schemes under rational-basis scrutiny. 505 U.S. 1, 31, 112 S.Ct. 2326, 120

L.Ed.2d 1 (1992)(citing *Allegheny Pittsburgh Coal Co. v. County Comm'n of Webster County, West Virgina*, 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688 (1989); *Hooper v. Bernalillo County Assessor*, 472 U.S. 612, 105 S.Ct. 2862, 86 L.Ed.2d 487 (1985); *Williams v. Vermont*, 472 U.S. 14, 105 S.Ct. 2465, 86 L.Ed.2d 11 (1985); *Metropolitan Life Ins. Co. v. Ward*, 470 U.S. 869, 105 S.Ct. 1676, 84 L.Ed.2d 751 (1985); *Zobel v. Williams*, 457 U.S. 55, 60–61, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982)).

### 1. Governmental Interest

The government suggests that the purposes of the semiautomatic assault weapons ban are to protect public safety (including the safety of law enforcement officers) and to deter criminal activity. (Def. Br. at 2, 4)(citing legislative history). Plaintiffs, on the other hand, suggest that the "perceived problem to be addressed by the ban is criminal violence (shooting) committed with 'semiautomatic assault weapons.'" (Pl. Br. at 2.) In general, a court's interpretation of the legislature's reasons for passing a certain statute should be broad. In fact, the Supreme Court has variously explained that courts need only find "'plausible reasons' for Congress' action," *Federal Communications Commission v. Beach Communications, Inc.* 508 U.S. 307, 313–14, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)(citing *United States Railroad Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980)), and that "statutory classifications will be set aside only if *no grounds* can be conceived to justify them." *McDonald v. Board of Election Commissioners of Chicago,* 394 U.S. 802, 809, 89 S.Ct. 1404, 22 L.Ed.2d 739 (1969)(emphasis added) (citations omitted). In other words, as long as the court can arguably conclude that the semiautomatic assault weapons ban bears a rational relationship to an appropriate governmental end, the court should not invalidate the statute. Rotunda and Nowak at § 18.3. Whether or not the "ends" proffered by the government in the instant case are actually those implicitly intended by Congress is of little consequence—they are plausible.

Accordingly, the court rejects plaintiffs' interpretation of the purpose of the semiautomatic assault weapons ban as too narrow—especially when defined simply as "shooting"—and defers to the government's assertion that possible and plausible congressional purposes are to protect public safety and deter criminal activity. Such interests are rational. The rest of the court's opinion will proceed on that basis.[13]

### 2. Challenges to the Ban

Plaintiffs haphazardly present a number of arguments in an attempt to persuade the court that the semiautomatic assault weapons ban is not rationally related to a legitimate governmental interest. However, many of plaintiffs' arguments, though couched in terms of equal protection, amount to due process arguments revolving around vagueness. For example, plaintiffs argue, among other things, that "the definitions in [the semiautomatic assault weapons ban] ... make a classification so ill defined as to be incomprehensible," (pl. br. at 2), and that no one "can determine what the law means," (*id.* at 6), and that the terms "known as," (*id.* at 4–9), and "copies or duplicates," (*id.* at 9–13), are confusing. These arguments, while perhaps meritorious, are unavailing because they are not yet ripe. On appeal, the Sixth Circuit determined that the vagueness counts were "not currently fit for judicial resolution." *National Rifle Ass'n,* 132 F.3d at 291–92. The court of appeals based that determination, at least in part, on plaintiffs' failure to avail themselves of the formal procedure of applying to the BATF's Firearms Technology Branch for a "'final agency action' in regard to an interpretation of the provision alleged to be vague." *Id.* at 292. In other words, "a federal court should not intervene and determine whether a statute enacted by Congress is unconstitutionally vague on its face before the agency with rulemaking authority has had an opportunity to interpret the statute." *Id.* Plaintiffs proffer no evidence to indicate that they have since availed themselves of this procedure,[14] or that doing so would allow

---

**13.** Plaintiffs base most of their arguments on their narrow interpretation of Congress' intent in passing the semiautomatic assault weapons ban. Because the court has rejected that narrow interpretation, plaintiffs' subsequent arguments are seriously weakened.

**14.** The court notes that plaintiffs refer to a BATF determination regarding a Maadi, Mod-

this court to alter the Sixth Circuit's construction of the case.[15]

■ More meritoriously, plaintiffs present arguments which, although not labeled as such, appear to the court to be arguments of underinclusiveness. For example, plaintiffs argue that the prohibited firearms they manufacture or in which they deal are "identical in type, function and capacity," (pl. br. at 1), to nonprohibited firearms that other people manufacturer, deal in or sell. (*Id.*) For example, plaintiffs direct the court's attention to two rifles, one a MAADI and one a Norinco. Plaintiffs argue that the two rifles are "nearly identical, with parts which were interchangable." (*Id.* at 11–13.) The Norinco rifle is proscribed; the MAADI rifle is not. This, according to plaintiffs, is irrational.[16]

■ In analyzing plaintiffs' arguments, the court notes that plaintiffs' briefs at least implicitly indicate that the proscribed firearms are *nearly* identical, but not *actually* identical to the nonproscribed firearms. Such a distinction, although minor, is a distinction nonetheless. *See Benjamin,* 662 A.2d at 1238. While it appears to the court that plaintiffs may, in fact, be correct in their comparisons of prohibited and nonprohibited firearms, the fact that the semiautomatic assault weapons ban may be underinclusive does not necessarily deny them equal protection. "[M]ere underinclusiveness is not fatal to the validity of a law under the equal protection component of the Fifth Amendment, *New Orleans v. Dukes,* 427 U.S. 297[, 96 S.Ct. 2513, 49 L.Ed.2d 511] (1976);

*Katzenbach v. Morgan,* 384 U.S. 641, 657, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966), even if the law disadvantages an individual or identifiable members of a group." *Nixon v. Administrator of Gen. Serv.,* 433 U.S. 425, 471 n. 33, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (citations omitted); *see also Heller v. Doe,* 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)("[a] classification does not fail rational-basis review because it ... in practice results in some inequality"); *Benjamin,* 662 A.2d at 1238. Additionally, "[a] statute is not invalid under the Constitution because it might have gone farther than it did, or because it may not succeed in bringing about the result that it tends to produce." *Roschen v. Ward,* 279 U.S. 337, 339, 49 S.Ct. 336, 73 L.Ed. 722 (1929). "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency v. People of State of New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 93 L.Ed. 533 (1949). Congress must necessarily draw a line somewhere, and when it does, it "renders the precise coordinates of the resulting legislative judgment virtually unreviewable, since the legislature must be allowed leeway to approach a perceived problem incrementally." *Beach Communications,* 508 U.S. at 316, 113 S.Ct. 2096; *see also Dukes,* 427 U.S. at 303, 96 S.Ct. 2513. An initial determination of what is different and what is the same falls within the ambit of the legislature, not the judiciary. *See Texas v. Certain Named and Unnamed Undocumented Alien Children,* 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982).

---

el RML, 7.62x39 caliber rifle. (Pl. Br. at 12; Pl.Ex. L and K.) The determination, however, was made in relation to a separate case and its application, either globally or specifically, to the instant case is not clear.

**15.** The court observes that the Sixth Circuit has held a municipal ban on assault weapons, which is somewhat similar to the federal ban at issue, to be unconstitutionally vague. *Peoples Rights Organization, Inc. v. City of Columbus,* 152 F.3d 522, 536 (6th Cir.1998). Unlike the instant case, however, the vague-

ness challenges in *Peoples Rights Organization* were ripe. *Id.* at 530. It may be that a vagueness challenge to the semiautomatic assault weapons ban, once ripe, would be more successful than those currently before the court.

**16.** Plaintiffs also note, for example, that a pseudo AR–15 is a proscribed weapon, while a Ruger Mini–14 is not. (Pl. Br. at 11.) Plaintiffs propound that the weapons fire the same cartridge at the same rate of fire. (*Id.*)

Congress is not obligated, under equal protection, to regulate all semiautomatic assault weapons in order to regulate some of them; nor is Congress restricted to achieving its legitimate ends of public safety and reducing crime in one statute. And though Congress' assessments are not wholly beyond the reach of judicial review, the courts must afford those assessments great deference unless it can be shown that they defy rationality. Plaintiffs failed to meet that high factual burden here. Accordingly, the court finds that plaintiffs' arguments of underinclusiveness are without sufficient evidentiary support.

Plaintiffs further argue that the "Generic Features Test" is irrational. They argue that "[t]here is nothing in the record, or in [defendants' brief] which shows how the combination of two or more accessories, mounted on one semiautomatic rifle, can threaten public safety." (Pl. Br. at 14.) Plaintiffs also argue that "only a trained eye can detect" some banned firearms and some protected ones. According to plaintiffs, "none of the[ ] accessories increases the rate of fire, the ammunition capacity, or the power of a firearm to which it is attached." (*Id.*) However, such a supposition is tied to plaintiffs' proffer of the purpose of the ban—diminishing shootings—which the court has determined is not the only possible legislative purpose. In addition to the reasons already explained, as noted by defendants, "Congress reasoned that 'even if these characteristics were merely "cosmetic" in effect, it is precisely those cosmetics that contribute to their usefulness as tools of intimidation.'" (Def. Br. at 7)(citing legislative history).[17] The judiciary is not a "superlegislature," *Dukes,* 427 U.S. at 303, 96 S.Ct. 2513, and must, therefore, defer to the plausible possibility that Congress

passed the semiautomatic assault weapons ban in part to enhance public safety and deter criminal activity by regulating weapons which make criminals more intimidating, and therefore more powerful. *See Kasler,* 61 Cal.App.4th 1237, 72 Cal. Rptr.2d 260 (explaining that the California Legislature was "free to draw a distinction between otherwise mechanically identical weapons because, in its collective judgment, some were meaner-looking than others.")

Plaintiffs further argue that the semiautomatic assault weapons ban should be ruled invalid because it contains "inaccurate nomenclature," (pl. br. at 5), is possibly based on inaccurate statistics, (*id.* 8), or otherwise contains mistakes. For example, plaintiffs indicate (probably correctly so) that "a majority of names used [in the semiautomatic assault weapons ban] describe[ ], not semiautomatic firearms, but their fully automatic cousins." (*Id.* at 5.) The court, in acknowledging the probable accuracy of plaintiffs' contentions, shares their frustration in grappling with a poorly drafted statute. Nevertheless, when "there was evidence before the legislature reasonably supporting the classification, litigants may not procure invalidation of the legislation merely by tendering evidence in court that the legislature was mistaken." *Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 464, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981). Moreover, "it is not the function of courts to substitute their evaluation of legislative facts for that of the legislature," *id.* at 470, 101 S.Ct. 715, and "legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Communications,* 508 U.S. at 315, 113

17. In a related vein, plaintiffs argue that all semiautomatic weapons of the same caliber are functionally identical, and, therefore, the semiautomatic assault weapons ban prohibits the writing on the side of a gun. This, according to plaintiffs, is a restraint on free speech and, hence, a violation of the First Amendment. (Pl. Br. at 7, 15.) This argument may be susceptible to the same "intimidation" argument outlined above. Nevertheless, the court reads this argument with interest but determines that it is an argument made only in passing by plaintiffs and is, therefore, underdeveloped. Accordingly, the court will refrain from ruling on the issue.

S.Ct. 2096 (citations omitted). The Sixth Circuit has similarly explained that "[i]n determining whether legislation has a rational basis, the court does not question the wisdom of the legislation.... Nòr should the court substitute its conception of sound public policy for Congress'.... If there is a rational basis for the legislation some imperfections and inequalities will be tolerated." [18] *Dillinger v. Schweiker,* 762 F.2d 506, 508 (6th Cir.1985). The court, then, must abide the imperfections found within the semiautomatic assault weapons ban; plaintiffs' position, though perhaps meritorious, does not, by itself, render the statute unconstitutional.

In summary, "when no suspect class or fundamental right is involved, the party challenging the legislation has a heavy burden in demonstrating that the legislation is irrational." *Dillinger,* 762 F.2d at 508. Plaintiffs have not met that burden. The Supreme Court explained as follows:

> Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices. In areas of social and economic policy, a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification ... Where there are "plausible reasons" for Congress' action, "our inquiry is at an end."

*Beach Communications,* 508 U.S. at 313–14, 113 S.Ct. 2096; *see also Dillinger,* 762 F.2d at 508. Despite the fact that the court may entertain doubts about the "wisdom, fairness, or logic" of the semiautomatic assault weapons ban, there are plau-

sible reasons for Congress' passing of the ban. Hence, this court's inquiry is at an end.

## V. Conclusion

Accordingly, IT IS ORDERED that Defendants' Motion for Summary Judgment is GRANTED.

IT IS FURTHER ORDERED that Plaintiffs' Cross–Motion for Summary Judgment is DENIED.

---

18. These cases resonate with the tolerance Oliver Wendell Holmes once expressed about a law he thought inadvisable: "I hope and believe that I am not influenced by my opinion that it is a foolish law. I have little doubt that the country likes it and I always say, as you know, that if my fellow citizens want to go to Hell I will help them. It's my job." *Holmes–Laski Letters* (Cambridge, Mass.: Harvard University Press, 1953), pp. 248–49.